RIGGS NATIONAL CORPORATION
& SUBSIDIARIES, Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE SERVICE,
Appellee.

No. 98–1039.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 11, 1998.

Decided Jan. 12, 1999.

Thomas C. Durham argued the cause for appellant. With him on the briefs were Joel V. Williamson, Kim Marie Boylan, and Stephen M. Feldhaus.

Charles Bricken, Attorney, United States Department of Justice, argued the cause for appellee. With him on the brief were Loretta C. Argrett, Assistant Attorney General, and David English Carmack, Attorney.

Stephen D. Gardner was on the brief for amicus curiae National Foreign Trade Council, Inc.

Before: WALD, SILBERMAN, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Riggs Bank, asserting that it had paid taxes to the Brazilian government with respect to interest income on loans it had made to the Central Bank of Brazil, claimed foreign tax credits under § 901 of the Internal Revenue Code. The Commissioner disallowed the credits on the theory that Riggs was not "legally liable" for the tax under Brazilian law, and the Tax Court denied Riggs' petition for relief. We reverse.

I.

A.

Riggs National Corporation's subsidiary Riggs Bank was one of numerous banks that

made loans to the Central Bank of Brazil during the early to mid–1980s as part of a plan to rescue Brazil from a debt crisis. Riggs' loans were so-called "net loans." In a net loan, the borrower contractually agrees not only to pay interest to the lender, but also to pay any local (Brazilian) tax that the lender owes on that interest income. Every interest payment the lender receives is then free of local tax—the borrower has paid it. By contrast, in a "gross loan," the lender remains subject to local tax liability. In either type of loan, which party technically conveys the tax payment to the local government is of little moment. In a gross loan, either the lender could remit the tax to the local government or the borrower could withhold that amount and remit it to the local government on behalf of the lender. So too in a net loan (where the concept of "withholding" does not really apply because the interest payments are free of local tax), either the borrower could remit the tax to the local government or the borrower could send to the lender both the guaranteed net loan interest payment and the appropriate amount of tax payment on the understanding that the lender would then remit the tax to the local government. (In practice in Brazil, the borrower does the "withholding" of the local tax in the gross loan situation and the "paying" of the local tax in the net loan situation.) The real difference between gross loans and net loans lies not in who licks the stamp on the envelope to the Brazilian government, but in who bears the economic burden of the tax.

The key feature of a net loan is its placement of the risk of a change in the local tax rate on the borrower. If the local tax rate rises after the parties have set the interest rate, the lender continues to receive the same interest payment free of local tax—it is the borrower who suffers. On the other hand, if the local tax rate falls after the parties have set the interest rate, the lender still continues to receive the same interest payment free of local tax—but now the borrower has become better off because his assumed tax liability is lower.

Computing the lender's tax liability on a gross loan is easy: one simply multiplies the local tax rate by the amount of interest income. So if the local tax rate is 25% and the interest payment is $12 (assume a 12% interest rate and $100 principal), the lender's local tax liability is $3. Computing the lender's local tax liability on a net loan—which, recall, is assumed by the borrower—is slightly more complicated. The parties' loan agreement sets forth the interest income as an *after-tax* amount, which presumably would be smaller than the before-tax amount in a gross loan because, all things being equal, a borrower entering a net loan will get a lower interest rate in exchange for assuming the lender's tax liability. To maintain parity between the tax revenue from net loans and gross loans, the Brazilian government requires that the after-tax income specified in the parties' net loan agreement be adjusted—"grossed-up"—into a hypothetical before-tax amount. The "gross-up" adjustment requires one to look at the interest rate selected by the parties in their net loan agreement, then assume that the parties had chosen the gross loan form rather than the net loan form, and extrapolate the interest rate the parties would have agreed upon if they had entered a gross loan.[1]

The foregoing is best illustrated by an example. Suppose a lender extends a $100 net loan to a borrower, specifying a 9% annu-

---

1. We should point out that a net loan transaction between a United States lender and a United States borrower would implicate only United States tax law and would be treated entirely differently. The borrower's contractual assumption of the lender's tax liability would *not* relieve the lender of tax liability, for the borrower's discharge of the lender's tax liability on the interest income would itself constitute income to the lender. *Old Colony Trust Co. v. Commissioner of Internal Revenue,* 279 U.S. 716, 729, 49 S.Ct. 499, 73 L.Ed. 918 (1929); 26 U.S.C. § 61(a) (1994). If the borrower covenanted to pay not only the interest payment to the borrower and the lender's tax liability on the interest payment, but *also* the lender's tax liability on the income resulting from the borrower's discharge of the lender's liability on the interest payment, that additional payment would again constitute income to the lender. And so on. For whatever reason, Brazilian tax law does not lead us into this endless circle. Instead, it draws a line at the borrower's discharge of the lender's tax liability on the interest income—only the grossed-up amount of interest income is treated as income for purposes of Brazilian tax law.

ally compounded interest rate, and assume a local tax rate on interest income of 25%. In the first year of the loan, the lender will receive interest income of $9 (*i.e.*, 9% of the $100 principal), and this income will be free of local tax. The borrower of course pays the $9 interest payment to the lender. How much local tax does the borrower pay—on the lender's behalf—to the local government? We identify the interest rate the parties would have agreed upon had they selected the gross loan form, which is the interest rate necessary to provide the lender with the same $9 interest income if the *lender* had to pay his own local tax obligation. The answer is 12%. That interest rate would yield interest income of $12 to the lender in the first year of the loan; the local tax on this income would be $3 (*i.e.*, 25% of $12); and the lender would be left with $9 at the end of the day.[2]

The lender's Brazilian tax liability is only half of the story. In calculating his United States tax liability, the lender must include in gross income the interest payment he receives from the borrower *and* the Brazilian tax paid (on his behalf) by the borrower to the Brazilian tax collector. *Old Colony Trust Co. v. Commissioner of Internal Revenue*, 279 U.S. 716, 729, 49 S.Ct. 499, 73 L.Ed. 918 (1929); 26 U.S.C. § 61 (1994). But there is potentially also a benefit to our lender under U.S. tax law: the Internal Revenue Code allows a taxpayer to take as a credit against his U.S. tax liability on income earned in a foreign country the amount of foreign tax he has paid on that same income. *Id.* § 901.

This brings us to the dispute between Riggs Bank and the Commissioner. Riggs claims it is entitled to foreign tax credits in the amount of the Brazilian taxes paid *on its behalf* by the borrower, the Central Bank of Brazil, pursuant to a net loan agreement. The Commissioner disagrees, arguing that under Brazilian law, there was no obligation on either Riggs or the Central Bank to pay a

tax given the Central Bank's tax-immune status as a governmental entity, and so any payments made were voluntary and not a "creditable" tax for purposes of the foreign tax credit. (The Commissioner does not seek to "have his cake and eat it too" by denying Riggs the foreign tax credit *and* by including in Riggs' gross U.S. income the "voluntary payment" made by the Central Bank to the Brazilian Treasury—that illogical position, once advanced by the Commissioner, has been rejected and abandoned. *See Continental Illinois Corp. v. Commissioner of Internal Revenue*, 998 F.2d 513, 517–18 (7th Cir.1993).)

It is important to understand the nature of appellant's economic incentive in seeking the foreign tax credit to appreciate the Commissioner's concern. The lender's gross cash inflow is unaffected by the availability of the credit—the lender, pursuant to the net loan agreement, continues to receive the same guaranteed interest rate. Nor is there any effect on the lender's Brazilian tax liability; by definition, in a net loan, the lender has passed his Brazilian tax obligation to the borrower. The economic advantage stems, rather, from the effect on the lender's *U.S. tax liability*. Although the lender's U.S. tax liability increases by the U.S. tax rate multiplied by the amount of Brazilian tax paid on his behalf by the borrower, the lender's U.S. tax liability simultaneously decreases by the entire amount of the Brazilian tax. The key point is that the foreign tax credit is a credit—not a deduction. So long as the U.S. tax rate is less than 100%, the decrease in U.S. tax liability *outweighs* the increase. And the lender can then apply this excess tax credit toward offsetting the rest of his U.S. tax liability on this same foreign source income.

### B.

In 1983, appellant and several other banks contemplating extending net loans to the Central Bank of Brazil were well aware of

---

**2.** Although the trial-and-error method will suffice to identify the grossed-up interest rate, the adjustment can also be performed more formally. The equation is $r_g = r_n/(1-t)$, where $r_g$ is the interest rate the parties would have selected had they entered a gross loan rather than a net loan, t is the local tax rate, and $r_n$ is the interest rate the

parties actually selected in their net loan agreement. *See Continental Illinois Corp. v. Commissioner of Internal Revenue*, 998 F.2d 513, 516 (7th Cir.1993). Plugging in the numbers from the example set forth in the text, we can verify our trial-and-error calculation; $r_g = .09/(1—.25) = .12$; *i.e., 12%*.

the potential tax benefit just described and that a precondition to qualifying for the foreign tax credit was establishing that there was indeed a Brazilian tax for which they would be liable. Although, as we have noted, it was undisputed that Brazil imposed a tax on interest income paid by Brazilian borrowers to non-Brazilian lenders, the Central Bank is no ordinary Brazilian borrower. Rather, the Central Bank is a governmental entity and thus immune from tax on its own income under the Federal Constitution of Brazil. It might have been thought that the Central Bank's own tax immunity would not bear on its obligation to pay the tax on any loan, including a net interest loan, for in such a transaction the Central Bank would not really discharge its *own* tax obligation, but rather a tax obligation contractually assumed from the lender. But there was authority in Brazilian law for the proposition that the tax-immune status of an entity such as the Central Bank shielded not only its own income, but also the interest income of a foreigner who lends to that tax-immune entity in a *net loan* transaction. The Brazilian Supreme Court had so ruled, *see State of Parana v. Central Bank* (cited in *Riggs Nat'l Corp. v. Commissioner,* 107 T.C. 301, 342, 1996 WL 707024 (1996) (entered by Tax Court by order dated Oct. 15, 1997)), and the Brazilian Revenue Service issued an "officio" to the same effect, *see* SRF 368 (cited in *Riggs,* 107 T.C. at 313–14).

An on-point Brazilian Supreme Court decision and an unfavorable revenue service ruling did not, however, foreclose the Bank's hopes for a foreign tax credit. Brazil does not follow the common law rule of *stare decisis,* so the Supreme Court's prior opinion is not necessarily authoritative, and, as in the United States, the revenue service might be persuaded to change its view. Brazilian tax immune entities were obliged, under Brazilian law, to withhold taxes from *gross loan* interest payments, *see Federal Gov't v. Highway Dep't of the State of Parana* (cited in *Riggs,* 107 T.C. at 341)—notwithstanding their own tax immune status—so it could be contended that the contrary treatment of net

loans was anomalous. Appellant and other banks requested definitive guidance on the matter, and the Minister of Finance—the highest ranking Brazilian authority on tax matters—obliged them with a favorable private letter ruling, which under Brazilian law binds the parties.

The ruling concluded that the Central Bank—notwithstanding its tax-immune status—was required under Brazilian law to pay the tax obligation assumed from lenders in the contemplated net loan transactions. It explicitly stated that the Central Bank "must . . . pay the income tax on the interest paid." *Riggs,* 107 T.C. at 331.[3] The Minister distinguished the earlier revenue ruling. The loans to the Central Bank were regarded as unique in that the funds advanced to the Central Bank were—under the terms of the debt restructuring plan—available for relending by the Central Bank to private Brazilian borrowers. The Minister deemed it appropriate to "look through" the Central Bank to those ultimate private borrowers—so-called "borrowers-to-be"—for purposes of deciding the proper tax treatment of the loans. And it was settled Brazilian law that a private borrower in a net loan was required to pay the tax obligation it had contractually assumed from the lender. The Minister concluded that the "borrowers-to-be" aspect of the loans compelled an analogy to the garden variety private borrower situation, and that the Central Bank must "as a substitute for such borrowers [to-be] pay the income tax incident on the interest from January 1, 1984 to the end of the period of availability for such funds to be relent." *Id.*

Riggs assumed, based on this definitive ruling from Brazil's highest tax authority, that the Brazilian tax was a creditable tax under § 901 and it determined its U.S. tax liability accordingly in the years 1984–86. This involved including in gross income the interest payments as well as the Brazilian tax obligation discharged by the Central Bank, applying the U.S. tax rate to that amount, and finally crediting against that U.S. tax liability the amount of the Brazilian tax obli-

---

**3.** The ruling was actually prepared by the Secretaria da Receita Federal and then adopted by the Minister. The SRF is under the Minister of

Finance in the hierarchy of Brazilian taxing authority.

gation discharged by the Central Bank. The Commissioner disagreed that the asserted payments made by the Central Bank to the Brazilian tax collector constituted creditable taxes for purposes of § 901, redetermined Riggs' U.S. tax liability, and sent Riggs a notice of deficiency.[4] The Commissioner argued that a proper interpretation of Brazilian law led to the conclusion—notwithstanding the Minister of Finance's private letter ruling—that no Brazilian tax is imposed on either lender or borrower where the borrower is a tax-immune entity; therefore, any payments made were voluntary and not "taxes paid or accrued ... to any foreign country." 26 U.S.C. § 901(b)(1).

The Bank argued in the Tax Court that the Commissioner's theory depended on declaring ineffectual the Minister of Finance's private letter ruling, and that adoption of such a theory by the Tax Court would therefore run afoul of the act of state doctrine. The Tax Court disagreed—it viewed the private letter ruling as nothing "more than perhaps an administrative advisory opinion"—and thereupon engaged in a comprehensive review of Brazilian law on the issue of whether a tax-immune borrower in a net loan transaction is considered to assume the lender's tax obligation as a private borrower would, and thus whether that tax-immune borrower is *required* to pay that amount to the Brazilian tax collector. *Riggs*, 107 T.C. at 359. The Tax Court held that under Brazilian law, a tax-immune borrower such as the Central Bank is not required to pay the tax, and approved the Commissioner's determination that the asserted payments did not constitute creditable taxes for purposes of § 901.

## II.

Riggs Bank primarily relies on the act of state doctrine. The doctrine directs United States courts to refrain from deciding a case when the outcome turns upon the legality or illegality (whether as a matter of U.S., foreign, or international law) of official action by a foreign sovereign performed within its own territory. *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.*, 493 U.S. 400, 406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). It stems from separation of powers concerns; it reflects " 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." *Id.* at 404, 110 S.Ct. 701 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)); *see generally* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 443 cmt. a (1986).[5]

The government suggests that a foreign administrative official's interpretation of foreign law is not the type of act of state contemplated by the doctrine.[6] To be sure, the doctrine has been applied principally to more "tangible" acts. *See, e.g., Sabbatino*, 376 U.S. at 403–04, 84 S.Ct. 923 (expropriation of property); *Ricaud v. American Metal Co.*, 246 U.S. 304, 310, 38 S.Ct. 312, 62 L.Ed. 733 (1918) (same); *Underhill v. Hernandez*, 168 U.S. 250, 254, 18 S.Ct. 83, 42 L.Ed. 456

---

**4.** The amounts of foreign tax credit at issue for each year are:

| 1984 | $166,415 |
| 1985 | 181,272 |
| 1986 | 317,019 |

**5.** The doctrine does not operate by depriving courts of jurisdiction; rather it functions as a doctrine of abstention. *See In re Minister Papandreou*, 139 F.3d 247, 256 (D.C.Cir.1998). The party invoking the act of state doctrine has the burden of establishing the factual predicate for the doctrine's applicability. *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024, 1026 & n. 4 (6th Cir. 1990).

**6.** The government does *not* contend that the act of state doctrine is inapplicable here because one of the litigants, the Commissioner, is an execu-

tive branch official. Insofar as the Commissioner is an executive branch official, it might be thought that the separation of powers concerns underlying the doctrine are not present. While not yet endorsed by a majority of the Supreme Court, some justices have suggested an exception to the doctrine for cases in which the executive branch has represented in a so-called "Bernstein" letter, *see Bernstein v. N.V. Nederlandsche–Amerikaansche Stoomvaart–Maatschappij*, 210 F.2d 375 (2d Cir.1954), that it has no objection to denying validity to the foreign sovereign act. *See First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 768–770, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (opinion of Rehnquist, J., joined by Burger, C.J., and White, J.); *see generally* RESTATEMENT § 443 Reporter's Note 8.

(1897) (detention of person by sovereign official); *Credit Suisse v. United States Dist. Court for the Cent. Dist. of Calif.*, 130 F.3d 1342, 1347 (9th Cir.1997) (asset freeze orders); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1114 (5th Cir.1985) (promulgation of exchange control regulations). That we are unaware of cases treating an interpretation of law as an act of state, of course, does not foreclose the doctrine's applicability. We are, however, hesitant to treat an interpretation of law as an act of state, for such a view might be in tension with rules of procedure directing U.S. courts to conduct a *de novo* review of foreign law when an issue of foreign law is raised. *See* FED.R.CIV.P. 44.1; TAX COURT R. 146.

■ But, whether or not it can be said that the Brazilian Minister of Finance's interpretation of Brazilian law qualifies as an act of state, the Minister's order to the Central Bank to withhold and pay the income tax on the interest paid to the Bank goes beyond a mere interpretation of law. The Minister, after all, ordered that the Central Bank "must, in substitution of the future not yet identified debtors of the tax [*i.e.,* the borrowers-to-be], pay the income tax on the interest paid during the period in which the funds remained available for relending." *Riggs*, 107 T.C. at 331. Such an order has been treated as an act of state. *See Credit Suisse*, 130 F.3d at 1347 (asset freeze orders); *Callejo*, 764 F.2d at 1114 (exchange control regulations). The Tax Court's conclusion on Brazilian law—that no tax is imposed on a net loan transaction involving a governmental entity as borrower—implicitly declared "non-compulsory," *i.e.,* invalid, the Minister's order to the Central Bank to pay the taxes. The act of state doctrine requires courts to abstain from even engaging in such an inquiry.

The Commissioner nevertheless argues, and the Tax Court agreed, that the Minister's order to the Central Bank was not actually a *compulsory* order and thus not a "definitive" act of state. The Tax Court reasoned that Riggs' "experts did not elaborate on whether the Central Bank, under Brazilian law, was legally compelled to accept and follow the ruling," and speculated that the Central Bank would likely succeed in

overturning the ruling if it sought an appeal in the Brazilian courts. *Riggs*, 107 T.C. at 359. Here the Tax Court simply misread the record. *See Commissioner of Internal Revenue v. Duberstein*, 363 U.S. 278, 289–91, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). Both parties' experts testified that acts of an executive official such as the Minister are valid and binding until declared invalid by a Brazilian court, Bekin Dep. (cited in Joint Appendix ("J.A.") 353–54); Pedreira Aff. ¶ 7 (cited in J.A. 1156), and it is undisputed that no such invalidation has occurred. Moreover, appellant had no standing under Brazilian law to litigate the validity of the Minister's ruling; only the Central Bank had that right, and it declined to do so.

\* \* \*

The Commissioner argues that if the act of state doctrine requires courts to treat the Minister's ruling as binding, it would jeopardize the Commissioner's ability to determine when taxpayers are eligible for the foreign tax credit. That is not so. The Commissioner's challenge focused entirely on whether *Brazilian law* required the Central Bank to pay taxes on these loans to the Brazilian government. The Commissioner might have conceded the legitimacy of the Minister of Finance's order, but contended that under U.S. tax principles, the payments should not be considered a creditable tax under § 901. That alternative argument, if accepted by the Tax Court, would not run afoul of the act of state doctrine because it would not require the Tax Court to declare invalid the Minister's order to the Central Bank to make the payments; it would only require the Tax Court to interpret the U.S. tax consequences of those concededly mandated payments. *See Kirkpatrick*, 493 U.S. at 405, 110 S.Ct. 701. Inquiry into the U.S. tax consequences of foreign levies is what this area of tax law is all about, and is the premise of the Supreme Court's dictum in *Biddle v. Commissioner of Internal Revenue*, 302 U.S. 573, 579, 58 S.Ct. 379, 82 L.Ed. 431 (1938):

The phrase "income taxes paid," as used in our own revenue laws, has for most practical purposes a well understood meaning to be derived from an examination of the

statutes which provide for the laying and collection of income taxes. It is that meaning which must be attributed to it as used in section [901].

The Treasury's own regulation acknowledges the distinction between the Commissioner's claim in this case, which implicates the act of state doctrine, and the ordinary *Biddle*-type inquiry, which does not. The regulation provides, in relevant part: "Whether a foreign levy [is creditable for purposes of § 901] is determined by principles of U.S. law and not by principles of the law of the foreign country." 26 C.F.R. § 1.901–2(a)(2)(i) (1998). Ordinarily, the Commissioner takes the foreign country's laws and requirements as given and determines their U.S. tax consequences "by principles of U.S. law and not by principles of the law of the foreign country." *Id.* In this case, by contrast, the Commissioner focused on the *foreign country's* laws and requirements themselves and presented arguments based on *foreign law* that no payment requirement existed.

We think we understand why the Commissioner was so troubled by this transaction. The government's brief hinted that to allow the Bank to take the tax credit in this situation was to give it virtually "a free lunch"—at the American Treasury's expense. A national governmental borrower is different than a private borrower or a state borrower: although the Central Bank has assumed the lender's tax obligation in the net loan agreement, that transaction just requires the federal government to take a bit of money from one of its pockets and put it in the other. Whereas a private, or even a state borrower, in a net loan arrangement bears a real economic risk when it assumes the lender's tax liability and the loan transaction's terms—possibly through lower interest rates—presumably reflect that economic risk. But in this situation the economic risk seems artificial. According to both counsel, however, Treasury regulations do not admit of a distinction between the foreign tax credit treatment of a net loan with a central government entity as borrower and any other entities as borrowers. *See* 26 C.F.R. § 1.901–2(f)(2)(ii) Ex. 3; *see generally* II JOSEPH ISENBERGH, INTERNATIONAL TAXATION ¶ 29.12.3 (2d ed.1997).

Of course, the opportunistic nature of the Brazilian government's action is particularly vexing. The Minister's ruling essentially accomplished a one-time increase in Brazilian taxes from 0% to 25%, applicable, by virtue of the narrowly targeted borrowers-to-be-theory, only to the transaction between Riggs (and other foreign banks) and the Central Bank of Brazil; it had no effect on other Brazilian borrowers. But although we can visualize prophylactic regulatory measures that would prevent this device from being utilized, the Commissioner has not yet fashioned a legitimate legal challenge to Riggs' use of the foreign tax credit in this case.

\*　　\*　　\*

For the foregoing reasons, we reverse the decision of the Tax Court and remand the case so that the Tax Court may determine in the first instance which of Riggs' loans were subject to the Minister's ruling, whether the taxes were in fact paid by the Central Bank, and whether Riggs' credits must be reduced by the amount of any subsidies that the Central Bank may have received.

*So ordered.*