RIGGS NATIONAL CORPORATION AND SUBSIDIARIES, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 01–1121.

United States Court of Appeals, District of Columbia Circuit.

Argued March 15, 2002.

Decided July 12, 2002.

Thomas C. Durham argued the cause for appellant. With him on the briefs were Joel V. Williamson, Russell R. Young, Kim Marie Boylan, Charles W. Hall and Stephen M. Feldhaus.

Stephen D. Gardner was on the brief for amicus curiae National Foreign Trade Council, Inc. in support of appellant.

Charles Bricken, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief was David English Carmack, Attorney.

Before: SENTELLE, HENDERSON and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

This case returns to us after decision on remand by the United States Tax Court. Riggs Bank, asserting that the Central Bank of Brazil paid taxes to the Brazilian government on its behalf with respect to interest income on loans it had made to the Central Bank, claimed foreign tax credits under section 901 of the Internal Revenue Code. The Commissioner disallowed the credits and the Tax Court denied Riggs's petition for relief. Upon review, we conclude that official tax receipts that the Central Bank submitted on behalf of Riggs Bank are entitled to the presumption of regularity. Holding that the Commissioner failed to rebut this presumption through clear and specific evidence that the taxes had not, in fact, been paid, we reverse the decision of the Tax Court and hold that Riggs is entitled to the tax credits. We remand to the Tax Court for determination of whether the tax credits owed to Riggs should be reduced by offsetting subsidies reportedly paid to the Central Bank.

## I.   Background and Prior Proceedings

The origins of this case are set out more fully in our prior opinion *Riggs National Corporation & Subsidiaries v. Commissioner*, 163 F.3d 1363 (D.C.Cir.1999) (*Riggs II*), and will not be repeated at length here. We instead provide an overview of this case's prior history with a recitation of the facts giving rise to the issues now before us.

Riggs National Corporation's subsidiary, Riggs Bank ("Riggs"), made loans to the Central Bank of Brazil during the early to mid–1980's. These loans were of the "net loan" variety. In a net loan, the borrower contractually agrees to pay both the interest on the loan to the lender and any local (in this case, Brazilian) tax that the lender incurs as a result of the interest income. The attractiveness of such a loan is obvious: the lender receives the agreed upon interest income while the borrower is obligated to pay any tax that the lender owes on that interest. Making these types of loans even more appealing is an added benefit resulting from the United States's Internal Revenue Code ("IRC"). Under section 901 of the IRC, a United States taxpayer is able to take a credit against his U.S. tax liability on income earned in a foreign country equal to the amount of foreign tax paid on that income. 26 U.S.C. § 901. Thus, by providing ordinary net loans (i.e., net loans to individual foreign borrowers), Riggs could take a credit equal to the amount of taxes that Brazilian borrowers paid to Brazil on Riggs's behalf without running afoul of the IRC. *See Riggs II*, 163 F.3d at 1365; *Continental Illinois Corp. v. Commissioner*, 998 F.2d 513, 516–17 (7th Cir.1993).

At issue in *Riggs II* was the fact that the borrower was the Central Bank of Brazil, a government entity that is ordinarily immune from tax on its own income under the Federal Constitution of Brazil. Despite its tax immune status, and possibly because of pressure from foreign lenders who favored the tax credits under section 901, Brazil's Minister of Finance—the highest ranking Brazilian tax authority—ruled that the Central Bank was required under Brazilian law to pay the tax obligation it assumed from foreign lenders. The Minister of Finance justified his ruling under the rationale that the funds were available for "re-lending" by the Central Bank to private Brazilian borrowers. *See Riggs Nat'l Corp. v. Commissioner*, 107 T.C. 301, 331, 1996 WL 707024 (1996) (*Riggs I*). The Minister concluded that the Central Bank must, "as a substitute for such borrowers [to-be,] pay the income tax incident on the interest from January 1, 1984 to the end of the period of availability for such funds to be relent." *Riggs*

*II*, 163 F.3d at 1366 (quoting *Riggs I*, 107 T.C. at 331). In response, the Central Bank issued official tax receipts, called "DARFs,"[1] to the foreign lenders which purportedly indicated the amount of tax paid on the lender's behalf. This comported with the standard practice in Brazil: taxpayers submit DARFs and the accompanying tax payment to commercial banks, which then transfer the payments to the Banco do Brasil, a quasi-public, quasi-private bank that collects taxes on behalf of Brazil's National Treasury.

Despite the Minister's ruling that the Central Bank was required to pay the taxes, and despite the receipt of DARFs indicating that the taxes had been paid, the Commissioner rejected the DARFs as sufficient proof that the taxes were paid, reasoning instead that because the Central Bank was a tax immune entity, any tax payments made by the Central Bank were voluntary and not "taxes paid or accrued ... to any foreign country." 26 U.S.C. § 901(b)(1). The Commissioner consequently assessed a deficiency against Riggs. Before the Tax Court, Riggs submitted its DARFs as proof that the Central Bank paid the foreign taxes on Riggs's behalf. Riggs also provided the Tax Court with entries from the Banco do Brasil which purportedly showed that the Central Bank paid to the National Treasury the taxes withheld from its payments of interest to Riggs. The Tax Court, however, agreed with the Commissioner that the Central Bank was not obligated to pay the taxes and therefore disallowed the tax credits. *Riggs I*, 107 T.C. at 360. Riggs appealed.

On appeal, we held that the Minister of Finance's ruling that the Central Bank was obligated to pay the taxes was an act of state, which precluded the Commissioner from inquiring into its validity. We remanded "so that the Tax Court may determine in the first instance ... whether the taxes were in fact paid by the Central Bank" on Riggs's behalf, and whether any of the potential tax credits must be reduced by pecuniary benefits, or subsidies, paid to the Central Bank. *Riggs II*, 163 F.3d at 1369. Pecuniary benefits were originally instituted in 1975 and allowed Brazilian borrowers who paid interest to foreign lenders to receive a benefit, or subsidy, equal to a percentage of the amount of the tax paid with respect to the interest. The amount of the pecuniary benefit was originally 85 percent of the amount of the tax paid. It was reduced to 50 percent of the tax in July 1979, increased to 95 percent of the tax in December 1979, reduced to 40 percent of the tax in May 1980, and reduced to zero in June 1985. *See Riggs I*, 107 T.C. at 308.

On remand, the Tax Court ruled that Riggs failed to establish that the Central Bank had, in fact, paid the taxes at issue on Riggs's behalf. *Riggs Nat'l Corp. & Subs. v. Commissioner*, T.C. Memo.2001–12, 81 T.C.M. 1023, 2001 Tax Ct. Memo LEXIS 20, *66, 2001 WL 47274 (Jan. 22, 2001) (*Riggs III*). Specifically, the Tax Court noted that letters and spreadsheets the Central Bank submitted with the DARFs reported that, for some of the payments, a pecuniary benefit had been reported as received after June 28, 1985. That is, the Central Bank continued to report pecuniary benefit information in documents submitted to Morgan Bank, the Central Bank's agent to foreign lenders such as Riggs, after Brazil stopped providing the pecuniary benefits. Reasoning that errors of this sort would not have

---

1. Documento de Arrecadacao de Receitas Federais. DARFs are official forms authorized by the Brazilian government as the only form to pay taxes and prove payment of those taxes within Brazil.

been made if payment of the taxes had actually occurred (in other words, had the Central Bank actually paid the taxes, it would know that it did not receive a pecuniary benefit for those tax payments after June 28, 1985 and would therefore not report the receipt of such), the Tax Court found that the DARFs issued by the Central Bank were not reliable proof that the withholding taxes in issue had actually been paid by the Central Bank. *Id.* The Tax Court also disagreed with secondary accounting evidence relied on by Riggs to indicate that the taxes had been paid. *Id.* Consequently, the Tax Court ruled that Riggs was not entitled to the foreign tax credits at issue. *Id.* After ruling that Riggs was ineligible for the tax credits, the Tax Court had no occasion to reach the issue of whether Riggs's tax credits should be reduced by the value of any pecuniary benefits paid to the Central Bank. *Id.*

In this appeal, Riggs asserts that the Commissioner acted contrary to Treasury Regulations by refusing to accept the DARFs as definitive proof that the foreign taxes were paid. Riggs also contends that the DARFs are entitled to the presumption of administrative regularity and must be deemed reliable. Finally, Riggs argues that its foreign tax credits should not be reduced by the offsetting pecuniary benefits paid to the Central Bank. The Commissioner, however, contends that Riggs has the burden of proving its entitlement to the foreign tax credits. The Commissioner relies on the language of IRC § 905(b), which allows foreign tax credits only to the extent "the taxpayer establishes to the satisfaction of the Secretary" the amount of foreign tax paid. 26 U.S.C. § 905(b). The Commissioner argues that this section authorizes him to require more satisfactory proof that foreign taxes were, in fact, paid. The Commissioner also contends that Riggs waived its "presumption of regularity" argument by not raising it

before the Tax Court, but that even if a presumption of regularity exists with respect to the DARFs, irregularities accompanying the issuance and submission of the DARFs rebut that presumption. The Commissioner further contends that Riggs's secondary accounting evidence is unpersuasive to show that the taxes were actually paid to the National Treasury by the Central Bank.

## II. Analysis

### A. Availability of Foreign Tax Credits

When we remanded this case to the Tax Court for it to determine "whether the taxes were in fact paid by the Central Bank," *Riggs II*, 163 F.3d at 1369, the Tax Court was required to determine whether the taxes were paid within the meaning of section 901 of the Internal Revenue Code. Determining whether taxes for which a credit is sought under section 901 have been paid is governed by section 905 of the IRC. Section 905 reads in applicable part that the foreign tax credit "shall be allowed only if the taxpayer establishes to the satisfaction of the Secretary ... the tax paid...." I.R.C. § 905(b)(2). The amount the taxpayer claims as having been paid, and thus the amount of the credit sought, shall "be determined under regulations prescribed by the Secretary." *Id.* For the type of credit at issue in this case, Treasury Regulation § 1.905–2 requires that if a taxpayer corporation, like Riggs, seeks to claim a foreign tax credit, the taxpayer must submit a Form 1118, Computation of Foreign Tax Credit—Corporations. *See* Treas. Reg. § 1.905–2(a)(1). This form "must be carefully filled in with all the information called for and with the calculations of credits indicated. Except where it is established to the satisfaction of the district director that it is impossible for the taxpayer to furnish such evidence,

the taxpayer must provide upon request the receipt for each such tax payment if credit is sought for taxes already paid. . . . This receipt . . . must be either the original, a duplicate original, a duly certified or authenticated copy, or a sworn copy." Treas. Reg. § 1.905–2(a)(2). In this case, while Riggs must in the first instance submit direct evidence of foreign tax withholding and payment where possible (i.e., "the receipt for each . . . tax payment"), the district director has the discretion to accept secondary evidence. *See id.* § 1.905–2(b). Regardless of the evidence upon which the Commissioner ultimately relies, the taxpayer "must plainly establish his right [to the foreign tax credit] by showing that he has fulfilled all the conditions upon which the allowance of the credit is made to depend." *Irving Air Chute Co. v. Commissioner,* 143 F.2d 256, 259 (2d Cir.1944).

■ Riggs contends that it provided the Commissioner with both direct and secondary evidence that the taxes were paid on its behalf. It is undisputed that Riggs provided the Commissioner with a DARF, or tax receipt, for each tax payment credit that it sought, and that it recorded the amount of taxes paid on an accompanying Form 1118.[2] Riggs thus insists before this Court that the Commissioner failed to comply with Treas. Reg. § 1.905–2(a)(2) by not accepting the submission of the DARFs as definitive proof that the Central Bank paid the foreign taxes on Riggs's behalf. We disagree, although our disagreement is not fatal to Riggs's position. The regulations do not require the Commissioner to accept foreign tax receipts at face value. It follows that the regulations do not require the Commissioner to allow foreign tax credits without scrutinizing the tax receipts on which the claim for credits

is premised. In fact, the regulations do not require the Commissioner to take any action at all. Rather, the regulations only set forth the necessary evidence a taxpayer must provide, upon request, to the Commissioner if that taxpayer intends to *claim* a foreign tax credit. This evidentiary requirement does not require the Commissioner to accept the tax receipts as sufficient proof that the taxes were *paid.* Indeed, if, as here, the Commissioner questions the legitimacy of the accompanying receipts, section 1.905–2 in no way compels the Commissioner to ignore a perceived inconsistency and accept the receipts as unquestionable proof of payment. We conclude, therefore, that mere submission of a DARF is not absolute proof that the taxes reported therein were paid.

■ Although we hold that the submission of DARFs, as required under section 1.905–2, is not conclusive proof of a foreign tax payment, we nonetheless conclude that the DARFs are entitled to a presumption of regularity. Common law has long recognized a presumption of regularity for actions and records of public officials. *See United States v. Chemical Foundation,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926); *American Federation of Government Employees v. Reagan,* 870 F.2d 723, 727–28 & n. 33 (D.C.Cir.1989). The presumption also applies to the actions of tax officials and in applying United States tax law. *See R.H. Stearns Co. v. United States,* 291 U.S. 54, 62–63, 54 S.Ct. 325, 78 L.Ed. 647 (1934); *cf. Utah Power & Light Co. v. Pfost,* 286 U.S. 165, 190, 52 S.Ct. 548, 76 L.Ed. 1038 (1932). Most pertinently, it applies to the actions and records of foreign public officials. *See United States v. King,* 44 U.S. (3 How.) 773, 785–86, 11 L.Ed. 824 (1845); *Murarka v. Bachrack*

---

2. Indeed, the Tax Court accepted Riggs's DARFs into evidence as authenticated copies of the original tax receipts and agreed the receipts were official records of the Brazilian government.

*Bros., Inc.*, 215 F.2d 547, 552–53 (2d Cir. 1954). We therefore conclude that a DARF, as an official tax receipt of the Brazilian government, is entitled to a presumption of regularity. While not irrebuttable, this presumption may only be rebutted through clear or specific evidence. "The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Chemical Foundation*, 272 U.S. at 14–15, 47 S.Ct. at 6; *see also United States v. Studevent*, 116 F.3d 1559, 1563 (D.C.Cir. 1997). Thus the Commissioner must provide clear and specific evidence that the DARFs submitted on behalf of Riggs were inaccurate representations of the amount of tax paid by the Central Bank in order to justify its denial of Riggs's claimed tax credit.

The Commissioner argues that Riggs waived its "presumption of regularity" argument by not raising it before the Tax Court. We disagree. Riggs clearly argued before the Tax Court that the Commissioner had the burden of proving that the DARFs were inaccurate accountings of the amount of foreign tax paid on Riggs's behalf. Riggs's argument before this Court—that the DARFs must be given a presumption of regularity—is merely an improved articulation of that previously raised argument. Riggs is not raising a novel issue or argument before us that it failed to first bring before the Tax Court. Riggs is instead reasserting and restating its earlier position—that the Commissioner has the burden of disproving the accuracy of the DARFs, and the Commissioner failed to meet that burden.

■ The Commissioner argues next that inconsistencies in documents accompanying the submission of the DARFs "call into question" the accuracy and validity of the DARFs. Specifically, the Commissioner relies on the finding of the Tax Court that schedules, or spreadsheets, that accompanied letters from the Central Bank and that were submitted along with the DARFs indicated that the Central Bank had received a 40 percent pecuniary benefit with respect to the tax payments, even though the pecuniary benefit had by then been repealed. The Tax Court reasoned that:

> If, as [taxpayer] asserts, the Central Bank actually had paid withholding taxes on [taxpayer's] ... behalf ..., we then find inexplicable the Central Bank's erroneous actions well after June 28, 1985, in continuing to report its having received a nonexistent "pecuniary benefit."

*Riggs III*, 2001 Tax Ct. Memo LEXIS 20, at *65. Thus when making its finding that the foreign tax had not been paid, the Tax Court relied on the reported receipt of a pecuniary benefit after the benefits were reduced to zero. In the first instance, we note that an inconsistency that merely "call[s] into question" the validity of an official document is not "clear evidence" of that document's invalidity, or "clear evidence" of anything, for that matter. That being so, we are not convinced that the erroneous reporting of a pecuniary benefit in a document that accompanied the submission of an official government record entitled to a presumption of regularity, is clear and specific evidence that the official government record is itself erroneous. The spreadsheets and transmittal letters indicated the receipt of a nonexistent *pecuniary benefit*. The obvious irregularities in the accompanying documents do not, however, indicate clear and specific evidence that *taxes* reported as paid in the DARFs *were not paid*. At best, the accompanying documents reflect clerical errors; at worst, they reflect the erroneous

receipt of a disallowed pecuniary benefit. Neither scenario, however, is clear evidence that the Central Bank failed to remit foreign tax payments on behalf of Riggs, as indicated by the DARFs. Therefore, we conclude that the Commissioner did not rely on clear and specific evidence necessary to rebut the presumption of regularity that attaches to the DARFs.

We understand that the payment of foreign taxes and the receipt of a pecuniary benefit are necessarily related: while the pecuniary benefits were in effect, the pecuniary benefit was dependent on the payment of foreign taxes. As we understand the Brazilian tax system, a borrower paid the entire amount of interest owed on a foreign debt and then later received a credit equal to the amount of the pecuniary benefit. Such a system necessitates two separate and independent transactions. Perhaps if the payment of taxes and the receipt of the pecuniary benefits had taken place through one transaction (e.g., the borrower made interest payments that were already reduced by the amount of the pecuniary benefit), evidence of one (payment of the tax or receipt of the pecuniary benefit) might bear strongly upon the other. But given that the receipt of a pecuniary benefit was the result of a separate transaction, we are altogether unconvinced that the impossibility of one establishes the impossibility of the other. Thus the Central Bank's reported receipt of a nonexistent pecuniary benefit is not clear and specific evidence that the DARF, an official government document otherwise entitled to a presumption of regularity, is erroneous.

■ Inconsistencies or inaccuracies in documents accompanying official government records do not inherently rebut the presumption of regularity attaching to those official records, especially when the accompanying documents do not directly address the matter sought to be proved by the official records. Because the DARFs are entitled to a presumption of regularity, and because the Tax Court based its decision on inconsistencies in accompanying documents rather than the DARFs themselves, and because the accompanying documents did not in fact address the issue of whether the foreign taxes had, in fact, been paid, we conclude that the Commissioner did not have clear and specific evidence that the DARFs were themselves erroneous representations of Riggs's claimed tax credits.

As the Tax Court erroneously based its decision to reject the DARFs on the wrongly reported pecuniary benefit, we need not consider the other arguments, such as inconsistencies in Riggs's secondary accounting evidence, now offered by the Commissioner to explain the Tax Court's decision. We therefore reverse the decision of the Tax Court and hold that the foreign tax credits should have been allowed.

B. Offsetting Subsidies

In our initial remand of this case to the Tax Court, we directed it to determine whether any of Riggs's potential tax credits should be reduced by the pecuniary benefits, or subsidies, reportedly paid to the Central Bank. *Riggs II*, 163 F.3d at 1369. Given the Tax Court's decision in favor of the Commissioner, the Tax Court never reached this issue. As we now hold that the foreign tax credits should have been allowed, this issue is ripe for consideration. However, rather than decide this issue for the first time on appeal, we remand this case to the Tax Court solely to determine whether any of the tax credits owed to Riggs must be reduced by the subsidies reportedly paid to the Central Bank.

### III. Conclusion

The official actions of foreign governments are entitled to a presumption of regularity. While this presumption is not absolute, it may be rebutted only through clear and specific evidence. The DARFs submitted by the Central Bank indicating that it had paid taxes on Riggs's behalf are entitled to the presumption of regularity unless rebutted by the Commissioner. We conclude that irregularities in documents accompanying the DARFs that do not specifically pertain to whether the taxes had, in fact, been paid do not rise to the level of clear and specific evidence showing that the taxes were never remitted. We therefore reverse the decision of the Tax Court disallowing Riggs's tax credits for the taxes paid by the Central Bank on Riggs's behalf with respect to interest income on loans Riggs made to the Central Bank. We remand the case solely for the Tax Court to determine whether the tax credits should be reduced by any subsidies that may have been paid to the Central Bank.