T.C. Memo. 2001-12


UNITED STATES TAX COURT


RIGGS NATIONAL CORPORATION & SUBSIDIARIES, f.k.a. RIGGS NATIONAL
BANK AND SUBSIDIARIES, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]


Docket No. 24368-89.                    Filed January 22, 2001.


Joel V. Williamson, Thomas C. Durham, Kim M. Boylan, Charles
W. Hall, and Stephen M. Feldhaus, for petitioner.

Theodore J. Kletnick, William G. Merkle, Rebecca I.
Rosenberg, and Robert T. Bennett, for respondent.

---

[*]    This Memorandum Opinion supplements our Opinion in
Riggs Natl. Corp. & Subs. v. Commissioner, 107 T.C. 301 (1996),
revd. and remanded 163 F.3d 1363 (D.C. Cir. 1999).

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, Judge:  This case is before us on remand from the Court of Appeals for the District of Columbia Circuit.  See Riggs Natl. Corp. & Subs. v. Commissioner, 163 F.3d 1363 (D.C. Cir. 1999), revg. and remanding 107 T.C. 301 (1996).

The crux of the dispute involves petitioner's entitlement to foreign tax credits under section 901[1] during years 1984 through 1986 for Brazilian income tax purportedly withheld and paid by Banco Central do Brasil (the Central Bank) with respect to its restructuring debt interest remittances to petitioner.  The specific issues for decision are:  (1) Whether the Central Bank in fact paid withholding taxes on petitioner's behalf; and if so, (2) whether the Brazilian withholding tax potentially creditable to petitioner must be reduced by the amount of any subsidies that the Central Bank may have received.

In Riggs Natl. Corp. & Subs. v. Commissioner, 107 T.C. at 360 (Riggs I), we concluded that petitioner was not "legally liable" for purported Central Bank withholding tax payments, since we determined that the Central Bank was not required, under Brazilian law, to pay withholding tax on its restructuring debt interest remittances to petitioner.  We further determined that the withholding tax purportedly paid by the Central Bank on its

---

[1]  All section references are to the Internal Revenue Code for the years in issue.

restructuring debt interest remittances to petitioner was a noncompulsory amount, rather than a tax. Thus, we held that the purported withholding tax payments were not creditable to petitioner. See id. As a result, we did not decide whether the purported withholding tax payments were in fact made by the Central Bank. See id. at 360-361.

The Court of Appeals concluded that: (1) A March 1984 Brazilian IRS private letter ruling issued to the Central Bank was a "compulsory order" by the Brazilian Finance Minister to the Central Bank mandating that the latter pay the purported withholding taxes, and therefore, (2) petitioner was "legally liable" for the purported withholding tax payments the Central Bank made on petitioner's behalf. The Court of Appeals remanded the case to us to decide certain matters concerning petitioner's entitlement to foreign tax credits as a consequence of petitioner's being "legally liable" for the purported withholding tax payments made by the Central Bank on petitioner's behalf. Riggs Natl. Corp. & Subs. v. Commissioner, 163 F.3d at 1369.[2]

---

[2] Among other things, the Court of Appeals directed us to determine which of petitioner's restructuring debt loans were subject to the March 1984 Brazilian IRS ruling. The parties have now stipulated in evidence an exhibit that lists those loans and interest payments. This exhibit also lists and summarizes the related withholding receipts and other documents in the record that were issued in connection with each of the withholding tax payments that petitioner contends the Central Bank made on its behalf.

We incorporate herein the findings of fact set forth in Riggs I by this reference. We also incorporate herein the stipulations and exhibits in Riggs I by this reference. For ease of understanding, we repeat those facts set forth in Riggs I we deem necessary to clarify the supplemental findings set forth herein and the ensuing discussion resolving the issues for decision.

A. Background

Petitioner was one of hundreds of banks that were involved in the restructuring of Brazil's foreign debt in the early to mid-1980's. As relevant hereto, the restructuring of Brazil's foreign debt was divided into three phases. The Central Bank served as the borrower under certain agreements entered into in connection with phase I, phase II, and phase III of Brazil's foreign debt restructuring; the Brazilian Government guaranteed the Central Bank's obligations under these agreements.

As of the time of the phase I restructuring negotiations, there were as many as 600 foreign lenders holding outstanding Brazilian loans. Collectively, these lenders had issued thousands of outstanding loans to numerous Brazilian borrowers. Because it was not feasible to have the foreign lenders and their Brazilian borrowers renegotiate all these loans, the deposit facility agreement (DFA) mechanism was devised. Prior outstanding loans were left in place. When a prior loan borrower made a loan payment, the payment would be deposited with, and held by, the

Central Bank pursuant to a new loan entered into by the Central Bank and the foreign lender.

As a part of the restructuring, Brazil needed to obtain additional foreign capital to enable its economy to function. Much of this additional foreign capital was furnished under the credit guaranty agreement (CGA) entered into by the Central Bank and some of the foreign lenders. Only the 170 foreign lenders holding the largest amounts of outstanding Brazilian loans participated in the phase I CGA.[3] In contrast, almost all of the foreign lenders participated in the phase II CGA.[4]

The loans made to the Central Bank under the phase I DFA, phase I CGA, phase II DFA, and phase II CGA were net loans[5] that had repayment terms of 7 to 9 years. In the phase I and phase II DFA's and CGA's, provisions were made for funds that would otherwise be lent to the Central Bank, as borrower, to be alternatively lent or re-lent to other Brazilian persons and companies. Many of the foreign lenders wanted their customers to have some ability to borrow from the large amount of foreign exchange and capital to be provided by the CGA's and DFA's. The phase I DFA, phase II DFA, phase I CGA, and phase II CGA each

---

[3]   Petitioner did not participate in the phase I CGA.

[4]   No phase III CGA was entered into.

[5]   Certain consequences to the Brazilian borrower and foreign lender which result from having a net loan, as opposed to a gross loan, are more fully discussed infra.

provided that there would be an initial period of about 16 to 18 months during which DFA or CGA funds could alternatively be lent or re-lent to other Brazilian persons and companies (the relending period).[6]

The phase I restructuring agreements (which included a phase I DFA that covered the scheduled debt payments due in 1983 on prior outstanding Brazilian loans and a phase I CGA under which the Central Bank would be lent up to an additional $4.4 billion) were entered on February 25, 1983. The phase II restructuring agreements (which included a phase II DFA that covered the scheduled debt payments due in 1984 on prior outstanding Brazilian loans and a phase II CGA under which the Central Bank would be lent up to an additional $6.5 billion) were entered on January 27, 1984.

The phase III restructuring negotiations began around the fall of 1984 and continued through July 1986. On July 25, 1986, Brazil and its foreign lenders signed the phase III DFA. The phase III DFA covered the scheduled Brazilian foreign debt payments due in 1985 and 1986. Under the phase III DFA, any 1985 debt payments would be available for relending to other Brazilian persons and

---

[6] In connection with the phase III restructuring negotiations, the relending period for the phase II DFA was extended from June 30, 1985, to April 1986, and the relending period for the phase II CGA was extended from June 30, 1985, to March 1986.

companies during a specified relending period; 1986 debt payments, on the other hand, would not be available for relending.

The phase I DFA and the phase II DFA did not cover foreign debt payments that were due after January 1, 1985. During the phase III negotiations, Brazil and its foreign lenders agreed to six interim loan arrangements under which debt payments due from Brazilian borrowers after January 1, 1985, would be held by the Central Bank as "interim deposits". These interim arrangements required the Central Bank to pay the foreign lenders interest on the interim deposits on a "net quoted" basis (which is discussed infra). The interim arrangements did not provide for any relending period, as the Brazilians and the foreign lenders envisioned that these interim deposits would be rolled over into and covered under the phase III DFA.

The phase I DFA, phase I CGA, phase II DFA, phase II CGA, and phase III DFA loans were foreign currency loans. Each loan was made, and was to be repaid, in a specified foreign currency.

B. Brazilian Regulation of Foreign Lending in General

Brazil imposed restrictions on the receipt and exchange of foreign currency. By law, all loans from foreign lenders had to be registered and approved by the Central Bank. Through a registration process, the Central Bank set the range of acceptable interest rates, and periodically established the minimum repayment terms, of loans. Once the Central Bank approved a loan, the lender

remitted the proceeds (in foreign currency) to the borrower via a commercial bank in Brazil. The Brazilian bank converted the foreign currency into Brazilian currency by means of an exchange contract, whereby the borrower sold the foreign currency to the bank for Brazilian currency at the official exchange rate periodically set by the Central Bank.

The Brazilian borrower received a certificate of registration that enabled the borrower to effect payment of interest, and principal, in the foreign currency in which the loan was made. On each payment date, the borrower purchased foreign currency from a Brazilian bank at the official exchange rate. The Brazilian bank then tendered the foreign currency to the foreign lender.

C. Payment of the Withholding Tax Generally

Where withholding tax was required, Brazilian law prohibited remittance of an interest payment to a foreign lender without proof of payment of the withholding tax on the interest remitted abroad. Under Brazilian law, the borrower initiated payment of the withholding tax by submitting a Documento de Arrecadacao de Receitas Federais (DARF) and the accompanying tax payment to a commercial Brazilian bank. The bank making the interest payment in

foreign currency (which was subject to Brazilian tax) required the borrower to submit a completed DARF and the tax payment as evidence that the proper amount of the tax had been paid.[7]

## D. Net Loans and Gross Loans

As previously indicated, phase I DFA, phase I CGA, phase II DFA, phase II CGA, and phase III DFA loans were net loans.

In making loans to borrowers in Brazil and other countries, it was an accepted and common practice among foreign lenders to require that interest payments be made to them on a "net quoted" basis. A net loan is a loan in which the lender and the borrower agree that all payments of principal and interest to the lender, under the loan contract, will be made net of any applicable Brazilian taxes.

Under Brazilian law, when the Brazilian borrower under a net loan assumes the burden of withholding tax, the amount of interest remitted is considered net of tax and an adjustment known as a

---

[7]    The borrower would prepare the DARF and deliver a copy of it, and the registration certificate, to the Brazilian bank handling the payment of interest through a foreign exchange contract. The bank would then record the amount of interest and tax on the certificate of registration and submit the certificate, exchange contract, and DARF to the Central Bank for approval. Following approval by the Central Bank, the bank would remit the interest to the foreign lender and return to the borrower a stamped copy of the DARF, the certificate of registration (stamped), and a copy of the exchange contract. The borrower would send a copy of the DARF to the foreign lender, which then had proof (the DARF) that the withholding tax had been paid.

"gross up" is required for purposes of computing the withholding tax. This gross-up adjustment is computed as follows:

$$\text{Grossed-up interest} = \frac{\text{Net interest}}{1 - \text{Withholding tax rate}}$$

In contrast to a net loan, a gross loan is a loan in which there is no contractual agreement between the borrower and the foreign lender to pay taxes imposed by the borrower's country. With a gross loan, the Brazilian borrower deducts withholding taxes that are due from the interest specified under the loan contract and pays the lender the gross interest net of taxes.

From 1970 through 1986, net loans generally were the predominant type of loan extended by foreign lenders to borrowers in Brazil. With a net loan, the foreign lender shifts the risk of any increase in taxes imposed by the borrower's country to the borrower. Correspondingly, in a net loan, the borrower, not the foreign lender, benefits from any reduction in or waiver of taxes imposed by the borrower's country.

E. Institution of the Subsidy/Pecuniary Benefit

Under Decree-law 1,215, enacted May 4, 1972, the Brazilian Minister of Finance was given discretion to grant a reimbursement or reduction of, or exemption from, the withholding tax on interest provided: (1) The borrower's costs were reduced; (2) the loan was of national interest; (3) the loan met the minimum repayment term

set by the National Monetary Council;[8] and (4) the loan complied with other conditions set forth by the Ministry of Finance.

Decree-law 1,351, which was enacted on October 24, 1974, authorized the National Monetary Council to temporarily reduce the income tax on interest, commissions, and expenses remitted to persons residing or domiciled abroad. On the same date that Decree-law 1,351 was enacted, the Central Bank issued Resolution 305, which temporarily reduced the tax on interest, commissions, and expenses received on currency loans registered with the Central Bank from 25 percent to 5 percent.

Decree-law 1,411, enacted July 31, 1975, amended Decree-law 1,351 and allowed the National Monetary Council to: (1) Reduce the income tax on interest, commissions, and expenses remitted to persons resident or domiciled abroad, or (2) grant pecuniary benefits to Brazilian borrowers receiving loans in foreign currency.

On August 5, 1975, the Central Bank issued Resolution 334, which revoked Resolution 305, thereby reinstating the 25-percent withholding tax on interest, commissions, and expenses paid on currency loans registered with the Central Bank. The withholding

---

[8]    The National Monetary Council is a Government agency responsible for economic programs. Its members include the Finance Minister, the Central Bank's president, and representatives of the largest Brazilian commercial banks. The Finance Minister presides over the council's meetings. The council acts through the Central Bank.

tax rate remained at 25 percent throughout the years relevant to this case.

F.  Mechanics and Amount of the Subsidy/Pecuniary Benefit

On the same day that the 25-percent tax on interest was reinstated (i.e., August 5, 1975), the Central Bank issued Resolution 335, which provided that borrowers taking out foreign loans duly registered with the Central Bank would receive a pecuniary benefit equal to 85 percent of the tax paid on interest, commissions, and expenses due on such loans.

Also on August 5, 1975, the Central Bank issued Circular 266, which provided in part:

a.  a DARF would be issued for the payment of the 25-percent income tax on interest resulting from foreign currency loans;

b.  on the date of payment, the banking establishment receiving the payment would, by means of a credit to the borrower's account, pay the borrower the equivalent of 85 percent of the income tax; and

c.  the banking establishment receiving the tax payment would debit its own account entitled "Pecuniary Benefit-D.L. 1,411," and would charge the total value of the pecuniary benefit against the Central Bank.

On July 26, 1979, the pecuniary benefit was reduced to 50 percent of the tax; on December 7, 1979, the pecuniary benefit was

increased to 95 percent of the tax; and on May 8, 1980, the pecuniary benefit was reduced to 40 percent of the tax.

On June 28, 1985, the pecuniary benefit was reduced to zero through the issuance of Resolution 1,033 by the Central Bank.[9] Resolution 1,033 provided, in pertinent part:

BANCO CENTRAL DO BRASIL

Resolution no. 1,033

* * * the BANCO CENTRAL DO BRASIL hereby makes it public knowledge that, at a meeting held on this date, the NATIONAL MONETARY COUNCIL * * *

RESOLVED:

I - The pecuniary benefit specified in Resolution no. 335, dated 08.05.75, with later alterations, is hereby reduced to 0 (zero).

II - This Resolution will go into effect on the date of its publication.

Brasilia (DF), June 28, 1985
Antonio Carlos Braga Lewgruber
PRESIDENT

---

[9] The parties have stipulated and agreed to use June 28, 1985, as the date relating to the reduction of the pecuniary benefit to zero. As will be discussed infra, in the tax payment documentation issued to foreign lenders in connection with the Central Bank's post-June 28, 1985, interest remittances to them, the Central Bank continued to report that it was receiving a pecuniary benefit equal to 40 percent of the withholding tax the Central Bank was purportedly paying on the foreign lenders' behalf. As a result, petitioner, on its tax returns, reduced by 40 percent the foreign tax credits it claimed for Brazilian tax on the Central Bank's and other Brazilian borrowers' post-June 28, 1985, loan remittances to it, even though after June 28, 1985, no Brazilian borrower (including the Central Bank) actually received a pecuniary benefit in connection with its loan remittances made abroad.

## G. The March 1984 Brazilian IRS Ruling Issued to the Central Bank

In March 1984, the Brazilian IRS issued a private ruling to the Central Bank that provided: (1) Beginning January 1, 1984, under a borrowers-to-be theory, the Central Bank would be required to pay withholding tax on its restructuring debt interest remittances to the foreign lenders during the relending periods of the DFA's and CGA's; (2) the Central Bank would have to pay this Brazilian income tax on or before the last business day of the month following the month in which the withholding was made; and (3) the Central Bank would be entitled to receive any pecuniary benefit applicable to such withholding tax payments the Central Bank made.

On March 28, 1988, the Brazilian Finance Minister issued Portaria 164, holding that future restructuring debt interest remittances of the Central Bank would not be subject to withholding tax. Portaria 164 provided, in pertinent part:

> The Minister of State of Finance, exercising the authority conferred on him by Decree-law No. 1215 of May 4, 1972, resolves:
>
> I - Exemption from withholding of income tax is granted for remittance of interest, fees, expenses, discounts and other charges owed to parties resident or domiciled abroad, as a result of loan transactions, when the tax burden has been assumed [i.e., there is a net loan] by a legal entity of public internal law.
>
> II - The provisions of the preceding item shall apply to foreign currency deposits made at the Central Bank according to regulations of the National Monetary Council.

H. The Central Bank's Payment of Withholding Tax on Its Restructuring Debt Interest Remittances and the Caixa Unico System

In Brazil, Banco do Brazil, which among other things operated as a commercial bank, was the Brazilian National Treasury's agent for payment of taxes. During 1980 through 1986, the Central Bank collected and paid over to Banco do Brazil, for the account of the National Treasury, withholding taxes, export taxes, taxes on financial operations, and social security taxes. The withholding taxes the Central Bank collected and paid over included withholding tax on the salaries of its employees and withholding tax on its interest remittances to foreign lenders.

Before 1980, the Central Bank made tax payments to Banco do Brazil by issuing an administrative check. The check would be physically delivered to Banco do Brazil and then cashed through the normal check liquidation and payment procedure. Beginning in 1980, there was a change in the manner by which the Central Bank made tax payments. Rather than issuing an administrative check, the Central Bank credited Banco do Brazil's Banking Reserves Account at the Central Bank with the amount of the tax payment.

By law, all commercial banks were required to maintain a Banking Reserves Account at the Central Bank with a minimum balance equal to 20 percent of their demand deposits. Banco do Brazil, however, was not subject to this requirement because the Central

Bank would frequently credit and advance substantial funds to Banco do Brazil's Banking Reserves Account, because of the governmental functions and operations Banco do Brazil carried out.

Until 1965, when the Central Bank was formed, Banco do Brazil served as the country's sole monetary authority. During the times relevant to this case, Banco do Brazil was owned 51 percent by the Brazilian Government and 49 percent by private shareholders. From 1965 through 1986, Banco do Brazil had four primary functions: (1) Commercial banking, (2) monetary authority, (3) management, control, and distribution of currency, and (4) responsibility for bank clearing. Like the Central Bank, Banco do Brazil functioned as: (1) A lender of last resort to public-sector entities, (2) a development bank responsible for various subsidized credit programs of the Brazilian Government, and (3) a fiscal authority that managed the Brazilian Government's budget. Banco do Brazil and the Central Bank together performed a number of governmental functions, including their unified management and operation of Brazil's monetary and financial system under what was known as the caixa unico system.[10]

To perform its various governmental functions, Banco do Brazil needed access to funds. Funding was provided by the Central Bank. When Banco do Brazil, in carrying out its governmental functions,

---

[10] The Brazilian term "caixa unico" means a unified system of cash or financial management.

would draw down its Banking Reserves Account at the Central Bank below the legally required minimum level, the Central Bank would advance Banco do Brazil funds sufficient to replenish and maintain its reserves account at the required level. The Central Bank would level Banco do Brazil's reserves account daily. (Banco do Brazil and the Central Bank each maintained a movement account in which they kept track of the funds the Central Bank advanced to Banco do Brazil.)

The Central Bank financed the Brazilian Government's operations and the governmental functions that Banco do Brazil carried out through its issuance of (1) Brazil's currency and (2) governmental securities in the name of the National Treasury. Essentially, the automatic transfer mechanism previously described (whereby the Central Bank provided funds to Banco do Brazil though crediting its Banking Reserves Account) recognized and reflected that the Brazilian Government ultimately financed the governmental functions that Banco do Brazil and the Central Bank carried out.[11]

---

[11] The record does not reveal whether daily surplus funds in the Banking Reserves Account were turned over to Banco do Brazil or whether the Central Bank kept such surpluses in repayment of the funds it had advanced. When the caixa unico system ended in 1987, the Central Bank was owed several billions of dollars by Banco do Brazil. The liability of Banco do Brazil to the Central Bank, however, was offset by an equivalent liability that the National Treasury owed to Banco do Brazil. In ending the caixa unico system, a novation was effected whereby Banco do Brazil's liability to the Central Bank was canceled and the National Treasury directly assumed the liability that Banco do Brazil owed to the Central Bank.

On its books, Banco do Brazil made entries reflecting: (1) Transfers of Central Bank tax payments to Banco do Brazil's Banking Reserves Account at the Central Bank, (2) collections of Federal Government tax receipts, and (3) deposits of Federal Government tax revenues payable upon demand to the National Treasury.

From the record presented, we cannot determine whether or what entries were made on the respective books of the Central Bank and the National Treasury to reflect the Central Bank's payment of withholding tax on the restructuring debt remittances. Consequently, we are unable to determine: (1) Whether the Central Bank was reimbursed by the National Treasury for the withholding tax payments; or (2) whether the Central Bank received the pecuniary benefit based on the withholding tax payments. These two matters were raised in the Central Bank's ruling request and were discussed in the March 1984 Brazilian IRS ruling to the Central Bank.

Beginning in 1984, the Central Bank issued DARF's to the agent banks of the foreign lenders to whom it transmitted loan payments under the DFA's and CGA's, reflecting its withholding tax payments on restructuring debt interest remittances during the relending periods of the DFA's and CGA's. From 1984 through 1988, the Central Bank issued a total of 324 DARF's to these agent banks. As explained more fully infra, these 324 DARF's were group DARF's.

In connection with remitting a particular DFA or CGA interest payment to an individual foreign lender, the Central Bank did not

issue a separate DARF to that foreign lender specifying the withholding tax that had been paid by the Central Bank on that foreign lender's behalf on the interest remittance. Rather, the aforementioned 324 DARF's the Central Bank issued to the foreign lenders and their agent banks were group DARF's. Each DARF covered the collective withholding tax the Central Bank had paid on behalf of an entire group of foreign lenders subject to a particular withholding tax rate (i.e., a 12.5-percent withholding tax rate, a 15-percent withholding tax rate, or a 25-percent withholding tax rate). In its ruling request, the Central Bank, among other things, requested and received the Brazilian IRS's permission to issue these group DARF's. These group DARF's and other supporting documentation the Central Bank issued to the foreign lenders in connection with its restructuring debt interest remittances are discussed infra.

As previously indicated, no withholding tax payments were made by the Central Bank on the foreign lenders' behalf on restructuring debt interest remittances after March 28, 1988, the date the Brazilian Finance Minister issued Portaria 164, which provided that future interest payments on the restructured debt would not be subject to withholding tax.

I. The Central Bank's Continued Reports to the Foreign Lenders That It Received a "Pecuniary Benefit" on Its Withholding Tax Payments on Post-June 28, 1985, Restructuring Debt Interest Remittances to Them

Notwithstanding that on June 28, 1985, the pecuniary benefit had been reduced to zero, the Central Bank, in issuing DARF's to the

foreign lenders in connection with its post-June 28, 1985, restructuring debt interest remittances to them, continued to report to the foreign lenders that it received a "pecuniary benefit" equal to 40 percent of the withholding tax imposed. For example, by letter dated November 19, 1985, Mancel Borges de Oliveira (Mr. Oliveira), a division head of the Central Bank's Department of Foreign Capital Fiscalization and Registration (FIRCE), forwarded to Morgan Bank (which served as the agent bank of the foreign lenders for the phase II CGA) group DARF's covering purported withholding tax the Central Bank had paid on behalf of numerous foreign lenders with respect to its phase II CGA interest remittances to them on September 27, 1985. Mr. Oliveira's November 19, 1985, letter to Morgan Bank stated, in pertinent part:

> We refer to the * * * [phase II CGA], among Banco Central do Brasil (the "Borrower"), Republica Federativa do Brasil (the "guarantor"), certain financial institutions (the "Banks") and * * * [Morgan Bank] (the "Agent"). Terms in this letter have the same meaning described to them in the * * * [phase II CGA].

> In this respect, in compliance with section 6.3 of the * * * [phase II CGA], we hereby provide you certified copies of [withholding] tax receipts evidencing the payment by Banco Central do Brasil, effected on September/85, which are attached.

In his November 19, 1985, letter, Mr. Oliveira provided the exchange rates the Central Bank had used in calculating the purported withholding tax imposed with respect to these interest remittances to various foreign lenders. Mr. Oliveira also enclosed supporting schedules the Central Bank had prepared setting forth

with respect to each specific September 27, 1985, Central Bank interest remittance to a foreign lender: (1) The withholding tax imposed, (2) the "40-percent pecuniary benefit" the Central Bank received, and (3) the "60-percent balance of actual withholding tax paid". For instance, with respect to the Central Bank's September 27, 1985, phase II CGA, tranche I interest remittance to petitioner, the Central Bank schedule reflected the following:

| Net Interest Remittance (U.S. $) | Grossed-Up Int. Paid (Cruzeiros)[1] | Tax (Cruzeiros) | "Pecuniary Benefit" (Cruzeiros) | "Balance Tax Paid" (Cruzeiros) |
|---|---|---|---|---|
| 17,441.66 | 180,742,108.69 | 45,185,527.17 | 18,074,210.86 | 27,111,316.30 |

[1] The Central Bank used the following formula to compute this amount:

$$\text{Grossed-up int. paid (cruzeiros)} = \frac{\text{Net int. remittance (foreign currency)} \times \text{Applic. exchange rate}}{1 - \text{Withholding tax rate}}$$

(On Sept. 27, 1985, the Central Bank used an exchange rate of $1 (U.S.) to 7,772 cruzeiros.)

On or about January 21, 1986, Morgan Bank forwarded copies of the aforementioned DARF's and schedules that the Central Bank had issued in connection with its September 27, 1985, phase II CGA interest remittances to each of the foreign lenders participating in the phase II CGA. The letter, dated January 21, 1986, by which Morgan Bank enclosed these documents to the foreign lenders, stated, in pertinent part:

Re: [Phase II CGA] with * * * [Morgan Bank]
as Agent.

Dear Sirs:

Enclosed please find withholding tax receipts and supporting schedules evidencing the payment in Cruzeiros to the National Treasury of Brazil with respect to the above referenced loan. The tax receipts and schedules apply to Tranches I thru VII for the interest period June 28, 1985 to September 27, 1985.

In the past, the schedules (Item Number 3 below) were sorted out for each bank [i.e., participating foreign lender]. In order to expedite mailing, we have enclosed a complete printout, as received from the Central Bank. Please disregard schedules not pertaining to your participation.

*    *    *    *    *    *    *

Very truly yours,
/s/ Vincent J. Montano
[Vice President of Morgan Bank]

Enclosures:

1. Conversion rate chart for loan currency to Cruzeiros.
2. Three tax receipts - one for each applicable [withholding tax rate] percentage (12.5, 15, and 25 percent) for each of the 7 tranches.
3. Corresponding supporting schedules for each of the 7 tranches (an explanation of each column is listed below):

　　　1st column represents - Interest paid
　　　2nd column represents - Cruzeiros equivalent of interest paid [i.e., grossed-up interest paid]
　　　3rd column represents - Tax in cruzeiros
　　　4th column represents - 40% cruzeiros tax rebate amount [i.e., pecuniary benefit]
　　　5th column represents - Balance (60%) of actual tax
　　　　　paid

The record contains a substantially similar letter of Morgan

Bank, dated August 1986, relating to the Central Bank's respective

phase II CGA restructuring debt interest remittances to the foreign lenders on December 30, 1985, and on March 26, 1986. In this August 1986 letter, Morgan Bank discussed certain group DARF's and supporting schedules the Central Bank had issued (copies of which Morgan Bank was forwarding to the foreign lenders) to evidence the Central Bank's withholding tax payments on those respective interest remittances. Among other things, Morgan Bank's August 1986 letter stated that the Central Bank schedules reflected that in connection with the withholding tax imposed on each specific interest remittance to a foreign lender: (1) The Central Bank received a "40% cruzados tax rebate amount" (i.e., pecuniary benefit);[12] and (2) there was a resulting "balance (60%) of actual tax paid".

On the basis of the aforementioned and other similar Central Bank tax payment documents issued to the foreign lenders (which erroneously reported the Central Bank was continuing to "receive" a "40-percent pecuniary benefit" in connection with its post-June 28, 1985, restructuring debt interest remittances to the foreign lenders), petitioner mistakenly believed the Central Bank had received a "40-percent pecuniary benefit" in connection with all of the Central Bank's restructuring debt interest remittances to petitioner from July 1985 through at least January 1987. Indeed, in a memorandum dated February 20, 1986, to petitioner's

_____

[12] By this time, the cruzado had replaced the cruzeiro as Brazil's new currency.

comptroller, petitioner's International Division reported that a total foreign tax credit of $22,714.14 (equal to 60 percent of the 25-percent withholding tax imposed on the grossed-up interest payments) should be claimed by petitioner for the Central Bank's withholding tax payments on petitioner's behalf on the Central Bank's September 27, 1985, phase II CGA, tranche I through tranche VII interest remittances to petitioner.  This February 20, 1986, memorandum stated, in pertinent part:

Re: Tax Receipts - Borrower:  Banco Central do Brasil

Country: Brazil

Tax Rate: 60% of 25% grossed up

* * * * * * *

Attached are withholding receipts as follows:

| Period Of Interest From | To | | Principal US $ | Interest US $ | Withholding Tax US | Cruzeiros | Exchange Rate |
|---|---|---|---|---|---|---|---|
| 6-28-85 | 9-27-85 | (Tranche I) | $613,333.00 | $17,441.66 | $3,488.25 | 27,111,316.30 | $7,772.00 |
| 6-28-85 | 9-27-85 | (Tranche II) | 613,333.00 | 17,441.66 | 3,488.25 | 27,111,316.30 | 7,772.00 |
| 6-28-85 | 9-27-85 | (Tranche III) | 613,334.00 | 17,441.69 | 3,488.33 | 27,111,362.93 | 7,772.00 |
| 6-28-85 | 9-27-85 | (Tranche IV) | 540,000.00 | 15,326.25 | 3,071.25 | 23,869,755.00 | 7,772.00 |
| 6-28-85 | 9-27-85 | (Tranche V) | 533,725.61 | 15,177.82 | 3,035.56 | 23,592,403.40 | 7,772.00 |
| 6-28-85 | 9-27-85 | (Tranche VI) | 540,000.00 | 15,356.25 | 3,071.25 | 23,869,755.00 | 7,772.00 |
| 6-28-85 | 9-27-85 | (Tranche VII) | 540,000.00 | 15,356.25 | 3,071.25 | 23,869,755.00 | 7,772.00 |

Total Tax Withheld  22,714.14

As a result (as will be discussed more fully infra), petitioner, on its tax returns, reduced by 40 percent (for the "pecuniary benefit" that petitioner mistakenly believed the Central Bank had received) the foreign tax credits it claimed with respect to all of the Central Bank's restructuring debt interest remittances to it from July 1985 through January 1987.  Specifically, in two separate memoranda (each dated March 30, 1987) to petitioner's

comptroller on the foreign tax credit to be claimed with respect to a January 1987 phase III DFA interest remittance, petitioner's International Division stated that a Brazilian tax rate of "60% of 25%" had been applied to the grossed-up January 1987 phase III DFA interest payment.

J.  Foreign Tax Credits in Dispute on Remand

On its income tax returns, petitioner generally reported its interest income and withholding tax payments with respect to its Brazilian loans on a cash basis.  Petitioner claimed a foreign tax credit and reported interest income gross-up when it received a DARF.  On its returns (including those for 1980 through 1986, which were the years originally in issue in this case), petitioner reduced the amount of the foreign tax credit it claimed in connection with its Brazilian loans by the pecuniary benefit provided by the Brazilian Government to Brazilian borrowers.

On its returns covering the period from January 1, 1980, through June 28, 1985, petitioner reduced the amount of its claimed foreign tax credits attributable to Brazilian loans by an amount equal to the pecuniary benefit available to Brazilian borrowers. Petitioner made this reduction in its claimed foreign tax credits for both nonrestructured and restructured Brazilian loans.

On its returns covering the period after June 28, 1985, through at least January 1987, petitioner continued to reduce its amount of claimed foreign tax credits attributable to Brazilian net loans by

40 percent, the amount of the pecuniary benefit before June 28, 1985. After June 28, 1985, petitioner continued to reduce its amount of claimed foreign tax credits by 40 percent for withholding taxes claimed on interest payments from Brazilian loans, even though the pecuniary benefit had been reduced to zero as of June 28, 1985.

In its amended petition, petitioner asserted, among other things, that the foreign tax credit otherwise allowable to it for 1980 through 1986 should not be reduced by the pecuniary benefit provided to Brazilian borrowers.

In the Stipulation Of Settled Issues filed with the Court on May 30, 1996, the parties agreed:

> A. On June 28, 1985, the Brazilian government effectively eliminated the subsidy/pecuniary benefit program by reducing the amount of the subsidy from 40% to zero.

> B. On its income tax returns for the taxable years ended December 31, 1985 and December 31, 1986, Petitioner reduced the amount of its claimed foreign tax credits for Brazilian tax on interest paid by Brazilian borrowers by an amount representing the subsidy/pecuniary benefit, even though Brazil reduced the subsidy/pecuniary benefit from 40% to zero on June 28, 1985.

> C. To the extent otherwise allowable, Petitioner's foreign tax credits for taxes paid after June 28, 1985 through December 31, 1986 are not subject to * * * [any reduction for a pecuniary benefit]

The total foreign tax credits in dispute between the parties in connection with the Central Bank's restructuring debt interest remittances to petitioner are as follows:

| Year | Credit |
|------|--------|
| 1984 | $166,415 |
| 1985 | 181,272 |
| 1986 | 528,365 |

Following the Court of Appeals' remand of this case, we instructed the parties to file written reports advising how we should implement the Court of Appeals' mandate. The parties then submitted to the Court their agreed proposal regarding the procedures to be used in implementing the mandate. In accordance with the parties' agreement, we issued an order on May 12, 1999, directing that the record in this case would not be reopened to allow either party to introduce additional factual information, documents, or testimony.

OPINION

Section 901 allows a domestic corporation to claim the amount of any income taxes paid or accrued during the taxable year to a foreign country as a credit against its Federal income tax (subject to certain limitations not applicable herein). See sec. 901(b)(1). The purpose of the credit is to reduce international double taxation. See American Chicle Co. v. United States, 316 U.S. 450, 452 (1942). In general, the person by whom foreign income tax is considered paid is the person upon whom foreign law imposes legal liability for the tax, even if another person (e.g., a withholding agent) remits the tax. See sec. 1.901-2(f)(1), Income Tax Regs. Foreign income tax generally may be considered paid by a taxpayer

even if another party to a transaction agrees, as part of the transaction, to assume the taxpayer's foreign tax liability on the taxpayer's behalf.  See sec. 1.901-2(f)(2), Income Tax Regs.

Issue 1.  The Payment Issue

Petitioner bears the burden of proving that the Brazilian income taxes for which it claims a credit were paid.  See secs. 901(b)(1),  905(b);[13]  see  also  <u>Continental  Ill.  Corp.  v. Commissioner</u>, 998 F.2d 513, 516-517 (7th Cir. 1993) (the taxpayer must establish foreign taxes for which it claims credit were not only withheld, but paid), affg. on this point T.C. Memo. 1991-66; <u>Lederman v. Commissioner</u>, 6 T.C. 991, 998-999 (1946) (holding that pursuant to Treasury regulations, proof of the amount of the foreign income tax withheld at the source will support a taxpayer's claim

---

[13]     Sec. 905(b) provides:

SEC. 905(b).  Proof of Credits.--The credits provided in this subpart shall be allowed only if the taxpayer establishes to the satisfaction of the Secretary --

(1)  the total amount of income derived from sources without the United States, determined as provided in part I,

(2)  the amount of income derived from each country, the tax paid or accrued to which is claimed as a credit under this subpart, such amount to be determined under regulations prescribed by the Secretary, and

(3)  all other information necessary for the verification and computation of such credits.

for credit, regardless of whether the credit claimed is for foreign tax paid or foreign tax accrued, but that the provisional or interim credit will be subject to adjustment if that withheld foreign tax is not actually paid to the foreign taxing authority);[14] Norwest Corp. v. Commissioner, T.C. Memo. 1995-453.

Section 1.905-2(a)(1), Income Tax Regs., mandates that tax credit claims made by corporations for foreign taxes be accompanied by Form 1118, Computation of Foreign Tax Credit--Corporations. Section 1.905-2(a)(2), Income Tax Regs., provides, in pertinent part:

> Except where it is established to the satisfaction of the district director that it is impossible for the taxpayer to furnish such evidence, the form must have attached to it (i) the receipt for each such tax payment if credit is sought for taxes already paid, or (ii) the return on which each such accrued tax was based if credit is sought for taxes accrued.

Section 1.905-2(b), Income Tax Regs., provides for the use of secondary evidence if a receipt or direct evidence of the amount of tax withheld at the source cannot be supplied for taxes already paid. Thus, pursuant to section 1.905-2(b), Income Tax Regs., while taxpayers in the first instance must submit direct evidence of

---

[14] However, as the Court of Appeals for the Seventh Circuit noted in Continental Ill. Corp. v. Commissioner, 998 F.2d 513, 516 (7th Cir. 1993), affg. in part and revg. in part T.C. Memo. 1991-66, where a net loan arrangement is involved and no funds are ever paid over to the foreign taxing authority by the borrower, difficulty exists in positing that there was a "withholding" of funds inasmuch as there is no subtraction of funds due and payable to the U.S. lender.

foreign tax withholding and payment, if possible, the district director may, in his discretion, accept secondary evidence that foreign withholding was in fact withheld and paid.

A. The Parties' Contentions

In its opening brief on remand, petitioner contends that through direct and secondary evidence it has established that the withholding taxes in issue were actually paid by the Central Bank on petitioner's behalf.

In his answering brief on remand, respondent contends that petitioner has failed to establish that the withholding taxes in issue were paid. Respondent maintains that (1) the evidence petitioner relies upon is manifestly unreliable, and (2) the Central Bank's continuing reports that it received a "pecuniary benefit" after June 28, 1985, suggests that the DARF's the Central Bank issued memorialized sham accounting entries. In this connection, respondent argues:

> Central Bank correspondence suggests that the DARFs memorialized sham accounting entries. If someone received a pecuniary benefit of 40% of the tax it paid, it is reasonable to expect some level of awareness. If the pecuniary benefit were eliminated, the taxpayer should know that it was paying 40% more in taxes. This is especially true when payments of hundreds of millions of cruzeiros are involved.

> Just the opposite occurred. The Central Bank provided letters conveying the DARFs to the agent banks. Schedules attached to each letter from the Central Bank report each bank's share of the relevant tax receipt and an amount of pecuniary benefit received by the Central Bank. * * * After June 28, 1985, the pecuniary benefit (subsidy) rate had been reduced to zero through

> Resolution 1033. Yet, the Central Bank continued to issue its letters and schedules (printouts) to the agent banks reporting its receipt of the pecuniary benefit (subsidy) through at least March 5, 1987, over a year and eight months after the pecuniary benefit (subsidy) was reduced to zero. * * * Exhibit 692-ZN(23) [the Nov. 19, 1985, letter from Mr. Oliveira to Morgan Bank discussed in our findings] clearly shows the Central Bank issuing an erroneous printout to the agent bank on November 19, 1985, reporting the "receipt" of a pecuniary benefit that should never have been paid. * * * Petitioner continued to report its Brazilian tax receipts net of a 40% subsidy through at least January, 1987, relying upon erroneous letters and underlying Central Bank printouts. * * * By continuing to generate DARFs that reported pecuniary benefit over a year and one half after its elimination, the Central Bank has provided evidence showing that its representations were, at best, inaccurate.

Respondent notes that in addition to Mr. Oliveira's letter of November 19, 1985, there were two Morgan Bank letters, respectively dated January 21, 1986, and August 1986, each of which was discussed supra.

In its reply brief on remand, petitioner denies that a substantial inconsistency exists in the evidence it offered to substantiate the Central Bank's actual payment of the withholding tax in issue. Specifically, petitioner denies that the Central Bank reported to the foreign lenders that it had continued to "receive" a "pecuniary benefit" in connection with its post-June 28, 1985, restructuring debt remittances and asserts:

> Respondent identifies several letters which he claims reflect receipt of the pecuniary benefit by the Central Bank after June 28, 1985, when the pecuniary benefit was reduced to zero. * * * An examination of the documents * * * shows the claimed inaccuracies do not exist. * * *

Exhibits 694-ZP(6) [the Jan. 21, 1986, Morgan Bank letter] and 694-ZP(7) [the August 1986 Morgan Bank letter] are both form letters from Morgan, not the Central Bank. * * * No printouts were attached to these Exhibits and thus they also cannot support Respondent's claim that the printouts showed the pecuniary benefit.

Finally, the parties have stipulated that Exhibit 692-ZN(23) relates to an interest payment for January 1985, well before the pecuniary benefit was eliminated. (Exhibit 697-ZS, p. ST004989)[15]  * * * Therefore, this document [Exhibit 692-ZN(23)], like the others, cannot support Respondent's claim.

### B. Substantial Inconsistency Concerning the Central Bank's Purported Withholding Tax Payments on Petitioner's Behalf

We agree with respondent that there is a substantial inconsistency in the evidence concerning the Central Bank's

---

[15]  Petitioner's argument overstates the parties' stipulation regarding Joint Exhibit 697-ZS.  As indicated supra, Joint Exhibit 697-ZS lists the restructuring debt loans and interest payments subject to the March 1984 Brazilian IRS ruling. This exhibit further lists and summarizes the related DARF's and other documentation in the record that were issued in connection with each of the purported withholding tax payments petitioner contends the Central Bank made on petitioner's and the other foreign lenders' behalf.  In that regard, the parties stipulated:

683.  The Court of Appeals for the D.C. Circuit, 163 F.3d 1363, 1369 (D.C. Cir. 1999) remand requires that the Court determine, among other things, "which of Riggs' loans were subject to the Minister's ruling." The parties agree that Joint Exhibit 697-ZS shows the amount of claimed withholding tax in the column captioned "Petitioner's Tax Amount (without subsidy reduction)" relating to loans which are subject to the Minister of Finance's ruling * * *

684.  Joint Exhibit 697-ZS summarizes the information set forth on the DARFs associated with the CGA and DFA interest payments which are subject to the Minister of Finance's ruling.  The DARFs and accompanying documents are included in the record as Joint Exhibits 661-YI through 694-ZP.

purported payment of withholding tax on petitioner's behalf.  As determined in our findings, the Central Bank reported that it was continuing to "receive" a "pecuniary benefit" in connection with its purported withholding tax payments on the foreign lenders' behalf on its post-June 28, 1985, restructuring debt interest remittances to them, notwithstanding that the Brazilian Government had reduced the pecuniary benefit to zero on June 28, 1985.  In arguing to the contrary, petitioner misinterprets the evidence of record.  Further, petitioner erroneously asserts that Mr. Oliveira's letter of November 19, 1985 (Joint Exhibit 692-ZN(23)), covers an earlier January 1985 phase II CGA interest payment. Petitioner's erroneous assertion regarding that letter rests solely upon an incorrect entry and likely typographical error in the parties' summary exhibit, Joint Exhibit 697-ZS.

Curiously, petitioner overlooks the seven September 1985 phase II CGA interest payments that were remitted after the Brazilian Government had reduced the pecuniary benefit to zero on June 28, 1985.  Joint Exhibit 697-ZS correctly lists Joint Exhibit 692-ZN(23) (Mr. Oliveira's letter of November 19, 1985, and its attachments) as covering those seven September 1985 interest payments. Moreover, the Central Bank schedule pages in Exhibit 692-ZN(23)[16] show that,

_____

[16]     These include Central Bank schedule pages covering the phase II CGA, tranche I, tranche II, tranche IV, tranche V, tranche VI, and tranche VII interest payments made to petitioner and other foreign lenders on Sept. 27, 1985.

in computing and setting forth the Central Bank's purported withholding tax payments on its September 1985 phase II CGA interest payments to various foreign lenders (including petitioner), the Central Bank used exchange rates that were applicable on September 27, 1985, and not exchange rates applicable in January 1985. For instance, in computing the "withholding tax imposed" on the September 27, 1985, phase II CGA, tranche I interest remittance of $17,441.66 (U.S.) to petitioner, the Central Bank employed an exchange rate of 7,772 cruzeiros to $1 (U.S.). A copy of the Central Bank foreign currency conversion rate chart (in Joint Exhibit 692-ZN(23)) enclosed in Mr. Oliveira's letter of November 19, 1985, is contained infra in appendix A. See also infra note 19 concerning the exchange rate of 3,381 cruzeiros to $1 (U.S.) that the Central Bank used to compute the "grossed-up interest paid" on its January 16, 1985, phase II CGA interest remittance to petitioner.

Contrary to petitioner's argument, the Central Bank schedule pages in Joint Exhibit 692-ZN(23) reflect that the Central Bank itself continued to report to the foreign lenders that it received a "pecuniary benefit" equal to 40 percent of the "withholding tax imposed" on its September 1985 phase II CGA interest payments to them, even though after June 28, 1985, no Brazilian borrower actually received a pecuniary benefit in connection with its interest remittances abroad. A copy of the Central Bank schedule

page in Joint Exhibit 692-ZN(23), setting forth (1) the "withholding tax imposed", (2) the "40-percent pecuniary benefit" the Central Bank received, and (3) the purported "balance (60 percent) of actual withholding tax paid" by the Central Bank, on its September 1985 phase II CGA, tranche I interest payments to petitioner and other foreign lenders, is contained infra in appendix B. (The information from this schedule page concerning the Central Bank's September 27, 1985, phase II CGA, tranche I net interest remittance of $17,441.66 (U.S.) to petitioner, is discussed in our findings.) Indeed, (1) the Morgan Bank letter dated January 21, 1986 (Joint Exhibit 694-ZP(6), pertinent portions of which are quoted in our findings), and (2) petitioner's own "comptroller's memorandum" dated February 20, 1986 (Joint Exhibit 695-ZQ(4), pertinent portions of which are quoted in our findings), reflect that these Central Bank schedule pages enclosed in Mr. Oliveira's November 19, 1985, letter, covered phase II CGA, tranche I through tranche VII interest payments for the period from "June 28, 1985 to September 27, 1985". The Morgan Bank letter and the comptroller's memorandum each further confirm that the Central Bank had reported "receiving" a "40-percent pecuniary benefit" in connection with its purported withholding tax payments on those September 27, 1985, phase II CGA interest payments.

Although Joint Exhibit 697-ZS (which summarizes and lists the related DARF's and other documents issued in connection with the

Central Bank's restructuring debt interest remittances from 1984 through early 1988) lists Joint Exhibit 692-ZN(23) as covering an earlier January 1985 phase II CGA interest payment to the foreign lenders, an examination of various underlying documents shows this summary listing to be a misstatement and possibly a typographical error. We note that November 19, 1985, not September 6, 1985, is the date of the Central Bank letter in Joint Exhibit 692-ZN(23). Yet, in erroneously listing Joint Exhibit 692-ZN(23) as the Central Bank letter transmitting the DARF's covering the January 1985 phase II CGA interest payment, Joint Exhibit 697-ZS incorrectly states the date of the Central Bank letter in Joint Exhibit 692-ZN(23) to be September 6, 1985. We also note that Joint Exhibit 697-ZS lists, immediately after the January 1985 phase II CGA interest payment, later March, April, and June 1985 phase II CGA interest payments. With respect to those later March, April, and June 1985 phase II CGA interest payments, Joint Exhibit 697-ZS correctly lists Joint Exhibit 692-ZN(22) (consisting of a Central Bank letter dated September 6, 1985, and some of that letter's attachments) as the Central Bank letter transmitting the DARF's pertaining to those interest payments.[17] Moreover, with respect to the January, March, April, and June 1985 phase II CGA interest payments, Joint Exhibit

---

[17] The Central Bank's Sept. 6, 1985, letter transmitted DARF's purporting to evidence various withholding tax payments, including those tax payments effected in January, March, April, and June 1985.

697-ZS correctly lists Exhibit 694-ZP(5) as the December 5, 1985, agent bank letter covering those interest payments.[18]  In contrast, in connection with the various September 1985 phase II CGA payments, Joint Exhibit 697-ZS correctly lists Joint Exhibit 694-ZP(6) as the January 21, 1986, agent bank letter covering those September 1985 interest payments.  As discussed supra, by this January 21, 1986, letter (which is quoted in our findings), Morgan Bank was forwarding DARF's and supporting schedules purporting to evidence the Central Bank's alleged withholding tax payments on the foreign lenders' behalf for the "interest period June 28, 1985 to September 27, 1985".

Further examination of Joint Exhibit 692-ZN(23) discloses that Mr. Oliveira, by his November 19, 1985, letter, was transmitting DARF's covering only the phase II CGA interest payments the Central Bank had made on September 27, 1985, not the January 1985 phase II CGA interest payment.  Mr. Oliveira's letter makes no mention of any January 1985 phase II CGA interest payment; the letter states only that DARF's for "withholding tax payments" effected "September /85" were attached.  Joint Exhibit 692-ZN(23) also contains no Central Bank schedule page covering any January 1985 phase II CGA interest

---

[18]    Indeed, the Dec. 5, 1985, Morgan Bank letter (in Joint Exhibit 694-ZP(5)) stated DARF's and supporting schedules were enclosed covering phase II CGA interest payments made on the following specified dates in 1985:  January 16; March 7; March 11; March 12; March 27; April 16; June 12; June 18; June 27; and June 28.

payments.  See supra note 16.  In comparison, as was noted supra note 17, the Central Bank's letter of September 6, 1985 (Joint Exhibit 692-ZN(22)), states the Central Bank was transmitting DARF's covering phase II CGA interest payments that had been made by the Central Bank in January, March, April, and June 1985.  Indeed, one of the Central Bank schedule pages in Exhibit 692-ZN(22) covers various interest payments made to petitioner and other foreign lenders on January 16, 1985.  In preparing this schedule page covering those January 16, 1985, interest payments, the Central Bank used an exchange rate of 3,381 cruzeiros to $1 (U.S.), not an exchange rate of 7,772 cruzeiros to $1 (U.S).[19]  As was previously discussed, the latter exchange rate of 7,772 cruzeiros to $1 (U.S.) applicable on September 27, 1985, was used in preparing the Central Bank schedules in Exhibit 692-ZN(23).  See infra appendices A and B.

Notwithstanding petitioner's argument to the contrary, the Central Bank schedules that Mr. Oliveira (a FIRCE division head)

---

[19]    This Central Bank schedule page (in Exhibit 692-ZN(22)) reflects that with respect to the Jan. 16, 1985, phase II CGA interest payment of $18,465 (U.S.) to petitioner, the Central Bank computed the "grossed-up interest paid" to be 83,240,220 cruzeiros.  Considering the gross-up formula the Central Bank employed, we calculate the Central Bank on Jan. 16, 1985, had used an exchange rate of 3,381 cruzeiros to $1 (U.S.).  In other words, that was the applicable exchange rate the Central Bank used in order to compute as follows that amount of "grossed-up interest paid" on its $18,465 (U.S.) net interest remittance to petitioner:

$$83{,}240{,}220 \text{ cruzeiros} = \frac{\$18{,}465 \text{ (U.S.) X } 3{,}381 \text{ (cruzeiros per dollar)}}{1 - 25\% \text{ withholding tax rate}}$$

enclosed in his November 19, 1985, letter, establish conclusively that the Central Bank itself erroneously reported to the foreign lenders its "receiving" a nonexistent "pecuniary benefit" on its purported withholding tax payments on post-June 28, 1985, restructuring debt interest remittances to them. See infra appendix B.

The record further reflects that for a substantial period after June 28, 1985, the Central Bank continued to report to the foreign lenders that it was "receiving" a nonexistent "pecuniary benefit" in connection with its post-June 28, 1985, restructuring debt interest remittances to them. This evidence includes a Morgan Bank letter, dated August 1986, relating to the Central Bank's respective phase II CGA interest remittances on December 30, 1985, and March 26, 1986. In discussing the group DARF's and supporting schedules the Central Bank had issued to the foreign lenders on those interest payments, Morgan Bank's August 1986 letter stated the enclosed Central Bank schedules reflected the Central Bank to have received a "40% cruzados tax rebate amount". As a result of these and other documents issued erroneously reporting the Central Bank's "receipt" of a "pecuniary benefit" in connection with its post-June 28, 1985, restructuring debt remittances to the foreign lenders, petitioner mistakenly believed the Central Bank and other Brazilian borrowers were continuing to "receive" a "pecuniary benefit" well after June 28, 1985. In various memoranda to petitioner's comptroller on the

foreign tax credits petitioner should claim in connection with these post-June 28, 1985, restructuring debt interest remittances, petitioner's International Division reported that a Brazilian tax rate of "60 percent of 25 percent" had been imposed on the grossed-up interest payments. On its 1985 through 1987 returns, petitioner thus reduced by 40 percent its claimed foreign tax credits for Brazilian tax on interest paid by Brazilian borrowers after June 28, 1985.

C.  Certain Other Payment Evidence Offered by Petitioner

As Joint Exhibit 697-ZS reflects, in addition to the DARF's the Central Bank issued, the record contains a number of purported letters the Central Bank issued to Banco do Brazil in connection with the Central Bank's alleged restructuring debt withholding tax payments. In these letters, the Central Bank ostensibly advised Banco do Brazil that it had credited Banco do Brazil's Banking Reserves Account at the Central Bank with the amount of the purported tax payments covered in the copies of the DARF's the Central Bank was also enclosing to Banco do Brazil.

Petitioner has further offered the testimony of Rolf von Paraski, its expert on how Banco do Brazil (the Brazilian Government's agent for payment of taxes) accounted for its withholding tax collections. Mr. von Paraski examined one purported withholding tax payment of the Central Bank on its July 1985 phase II DFA interest remittances to the foreign lenders, which he

selected at random.  Mr. von Paraski verified that certain entries had been made on Banco do Brazil's books reflecting Banco do Brazil's collection of this purported withholding tax payment from the Central Bank.

We find Mr. von Paraski's testimony far from dispositive in establishing actual payment by the Central Bank of the purported withholding tax payments in issue.  As stated earlier in our findings, on the basis of the record before us, it is impossible to determine whether or what entries were made on the respective books of the Central Bank and the National Treasury to reflect the Central Bank's purported restructuring debt withholding tax payments. Further, we are unable to determine what, if any, entries were made to determine:  (1) Whether the Central Bank was reimbursed by the National Treasury for its purported withholding tax payments, or (2) whether the Central Bank received the pecuniary benefit based on those alleged withholding tax payments.

Moreover, we find Mr. von Paraski's testimony to be unhelpful in other important respects.  Among other things, Mr. von Paraski did not specifically address whether the Central Bank had  received a "pecuniary benefit" in connection with its alleged withholding tax payment on the July 1985 phase II DFA interest remittances.[20]

_____

[20]    See infra note 21.  On its return, petitioner reduced the foreign tax credit it claimed for Brazilian tax on this July 1985 phase II DFA interest payment by the "40-percent pecuniary benefit" it mistakenly believed the Central Bank to have

(continued...)

Although petitioner notes certain testimony by Mr. von Paraski in which he mentioned offhand not knowing of any "refund" being made to the Central Bank of the alleged restructuring debt withholding tax payments, Mr. von Paraski did not actually inquire into (1) whether the Central Bank received the pecuniary benefit, or (2) whether any other transactions took place resulting in a "refund" being made of the Central Bank's "withholding tax payment". Mr. von Paraski examined the books and records of Banco do Brazil only to confirm that appropriate entries had been made on those books reflecting Banco do Brazil's ostensible collection of withholding tax from the Central Bank in connection with the July 1985 phase II DFA interest payment Mr. von Paraski had chosen to examine. He did not examine the respective books of the Central Bank and National Treasury to determine how the purported tax payment had been reflected and treated on their books. Hence, we accord little weight to Mr. von Paraski's testimony that he was unaware of such "refund" transactions having taken place, as he did not conduct a full inquiry into these matters.[21]

---

[20](...continued)
received.

[21]    In this connection, on direct examination, Mr. von Paraski testified:

       Q. Are you familiar with the pecuniary benefit that used to be paid to Brazilian borrowers of foreign currency loans?

(continued...)

At any rate, Mr. von Paraski's testimony sheds no light on the Central Bank's substantially inconsistent behavior in erroneously reporting to the foreign lenders that it continued to "receive" a nonexistent "pecuniary benefit" in connection with its post-June 28, 1985, interest remittances to them.  See _supra_ note 20.

---

[21](...continued)
A. Yes, I do.

Q. If you assume that the pecuniary benefit reduced the amount of taxes that were collected, are you aware of any other type of transaction that resulted in a partial or total refund of the tax amounts paid by the Central Bank on the restructured debt?

A. No, I have no knowledge of that.

Q. To your knowledge, other than in the case of the pecuniary benefit, were there any accounting entries made that negated, eliminated or reduced Banco do Brasil's collection of taxes from the Central Bank?

A. No, I have no knowledge.

D.  Conclusions[22]

We have substantial doubts as to (1) the reliability of the tax payment documentation and other evidence presented to substantiate the Central Bank's purported payment of withholding tax on petitioner's and the other foreign lenders' behalf in connection with its restructuring debt interest remittances to them, and (2)

---

[22]    In its opening and reply briefs on remand, petitioner alternatively argues that even if the tax was not, in fact, paid to the Brazilian National Treasury, in the case of a net loan to a governmental borrower, like the Central Bank, petitioner should, for purposes of sec. 901, be deemed to have paid the foreign tax liability where that liability has been assumed by the governmental borrower.  In arguing that actual payment is unnecessary and can be dispensed with where the foreign tax liability has been assumed by a governmental borrower, petitioner cites and heavily relies upon sec. 1.901-2(f)(2)(ii), Example (3), Income Tax Regs.  In his answering brief on remand, respondent, among other things, (1) disagrees that actual payment is unnecessary, and (2) disputes petitioner's interpretation of Example (3) of sec. 1.901-2(f)(2)(ii), Income Tax Regs.
    Notwithstanding the parties' foregoing arguments, we do not consider the deemed payment issue to be properly before us on remand because it is an issue outside the scope of the Court of Appeals' mandate.  In remanding Riggs I, the Court of Appeals directed us solely to determine "in the first instance which of Riggs' loans were subject to the Minister's ruling, whether the taxes were in fact paid by the Central Bank, and whether Riggs' credits must be reduced by the amount of any subsidies that the Central Bank may have received." Riggs Natl. Corp. & Subs. v. Commissioner, 163 F.3d at 1369.  Indeed, petitioner's position on appeal (which the Court of Appeals accepted) was that, pursuant to his Mar. 14, 1984, decision, the Brazilian Finance Minister had issued a "compulsory order", id. at 1368, to the Central Bank to pay this Brazilian income tax "on or before the last business day of the month following the month in which the withholding is made", Riggs Natl. Corp. & Subs. v. Commissioner, 107 T.C. at 329.  It appears difficult to conceive of the Minister's decision as being a "compulsory order" if the Central Bank did not actually have to pay this "tax" (as petitioner now alternatively argues).

whether the Central Bank actually paid the withholding taxes in issue. Petitioner offered no explanation as to why the Central Bank erroneously continued to report to the foreign lenders that it had received a "pecuniary benefit" in connection with its post-June 28, 1985, interest remittances to them, even though the pecuniary benefit had been reduced to zero through the Central Bank's issuance of Resolution 1,033 on June 28, 1985. In its erroneous reports to the foreign lenders, the Central Bank provided the lenders with detailed schedules in which it had computed with respect to each restructuring debt interest remittance made to a foreign lender: (1) The "40-percent pecuniary benefit" the Central Bank received, and (2) the "60-percent balance of actual withholding tax paid". If, as petitioner asserts, the Central Bank actually had paid withholding taxes on petitioner's and the other foreign lenders' behalf on its restructuring debt interest remittances to them, we then find inexplicable the Central Bank's erroneous actions well after June 28, 1985, in continuing to report its having received a nonexistent "pecuniary benefit". This is especially so in light of the Central Bank's prior issuance of Resolution 1,033 to make it "public knowledge" that the pecuniary benefit had been reduced to zero effective June 28, 1985.

Petitioner has failed to establish that the withholding taxes in issue were paid by the Central Bank on petitioner's behalf. The evidence presented leads us to conclude that the group DARF's are

untrustworthy and were concocted to substantiate legerdemain; i.e., they were devised to portray the appearance of the fictitious payments of taxes.  Accordingly, we find that the group DARF's do not constitute direct or secondary  evidence that the Central Bank paid withholding taxes on petitioner's behalf.  Moreover, we find nothing else in the record that constitutes credible direct or secondary evidence that the purported withholding tax payments were in fact made.  Consequently, we hold that petitioner is not entitled to foreign tax credits, during 1984 through 1986, under section 901 for the purported withholding tax payments by the Central Bank on its restructuring debt interest remittances to petitioner.  See sec. 905(b).

Issue 2.  The Subsidy/Pecuniary Benefit Issue

In light of our holding on the payment issue, we need not reach the issue of whether the Central Bank's purported "withholding tax payments" on petitioner's behalf (that are potentially creditable to petitioner) must be reduced by the amount of any pre-June 28, 1985, pecuniary benefit the Central Bank may have received and whether that benefit constitutes an indirect subsidy under section 1.901-2(e)(3)(ii), Income Tax Regs.  Compare <u>Continental Ill. Corp.</u>

v. Commissioner, T.C. Memo. 1991-66, with Amoco Corp. v. Commissioner, T.C. Memo. 1996-159, affd. 138 F.3d 1139 (7th Cir. 1998).

Decision will be entered as previously entered on October 15, 1997.

**APPENDIX A**

Central Bank Foreign Currency Conversion
Rate Chart In Joint Exhibit 692-ZN(23)

**BANCO CENTRAL DO BRASIL**

CONVERSION RATE ON 09.27.85

MOEDA

| | | |
|---|---|---|
| 220 US$ | 7.772.00 |
| 470 Y | 35.369 |
| 361 BF | 142.19 |
| 335 f. | 2.564.09 |
| 595 Lit | 4.2830 |
| 610 DM | 2.895.25 |
| 919 ECU | 6.395.19 |
| 165 CAN$ | 5.682.53 |
| 425 Sw.Fr. | 3.530.48 |
| 540 £ | 10.882.35 |

## APPENDIX B

### CENTRAL BANK SCHEDULE PAGE IN JOINT EXHIBIT 692-ZN(23)

BANCO CENTRAL DO BRASIL
DIRETORIA DA AREA EXTERNA
FIRCE
BRAZILIAN FINANCING PLAN-PHASE II/PROJECT A
IMPOSTO DE RENDA INCIDENTE SOBRE JUROS PAGOS EN 27.09.85.

| NOME DO CREDOR | MOEDA | AL JOUSTO I.R. | JUROS PROJ. A TRANCHE I | CONTRAVALOR BRUTO EN CRS DOS JUROS | IMPOSTO DE RENDA S/JUROS | BENEFICIO PECUNIARIO SOBRE JUROS | RECOMINENTO LIQUIDO DE I.R. S/JUROS |
|---|---|---|---|---|---|---|---|
| NORWEST BANK MINNEAPOLIS | 220 | .2500 | 5755.75 | 59644918.66 | 14911229.66 | 5964491.86 | 8946737.80 |
| PANAMERICAN BANK INTL. | 220 | .2500 | 3128.13 | 32415768.48 | 8103942.12 | 3241576.84 | 4862365.27 |
| PARTNERSHIP PACIFIC BANK N.V. | 220 | .2500 | 5704.59 | 59114764.64 | 14778691.16 | 5911476.46 | 8867214.69 |
| PHIBROBANK AG-ZUG | 220 | .2500 | .00 | .00 | .00 | .00 | .00 |
| PHILADELPHIA NAT. CORP.-PHIL. | 220 | .2500 | .00 | .00 | .00 | .00 | .00 |
| PHILIPPINE NAT. BANK | 220 | .2500 | 719.47 | 7455627.70 | 1863906.94 | 745562.77 | 1118344.16 |
| PHILLIP BROS. AG | 220 | .2500 | .00 | .00 | .00 | .00 | .00 |
| PICTET CIE | 220 | .2500 | 2558.11 | 26508841.22 | 6627210.30 | 2650884.12 | 3976326.18 |
| PIERSON HELBRING PIERSON NV-AMST. | 220 | .2500 | 1492.22 | 15463378.45 | 3865844.61 | 1546337.84 | 2319506.76 |
| PITTSBURGH NAT. BANK-PITTS. | 220 | .2500 | .00 | .00 | .00 | .00 | .00 |
| PR CHRISTIANIA BANK (UK) | 220 | .2500 | .00 | .00 | .00 | .00 | .00 |
| POSTIPANKI (UK) LTD. | 220 | .2500 | 12335.62 | 127829918.18 | 31957479.54 | 12782991.81 | 19174487.72 |
| PRIVATBANKEN AG | 220 | .2500 | 3575.20 | 37048405.86 | 9262151.46 | 3704860.58 | 5557290.88 |
| PROVIDENT NAT. BANK-PHIL. | 220 | .2500 | 10901.03 | 112963740.21 | 28240935.05 | 11296374.02 | 16944561.03 |
| RAINIER NAT. BANK, SEATTLE | 220 | .2500 | .00 | .00 | .00 | .00 | .00 |
| REPUBLIC NAT. BK OF NEW YORK | 220 | .2500 | 25313.29 | 262313186.50 | 65578296.62 | 26231318.65 | 39346977.97 |
| REPUBLICBANK DALLAS | 220 | .2500 | .00 | .00 | .00 | .00 | .00 |
| RHODE ISLAND HOSPITAL TRUST NT BK | 220 | .2500 | 5761.41 | 59703571.36 | 14925892.84 | 5970357.13 | 8955535.70 |
| RIGGS NAT. BK. OF WASHINGTON | 220 | .2500 | 17441.66 | 180742108.69 | 45185527.17 | 18074210.86 | 27111316.30 |
| RIYAD BANK LTD. | 220 | .2500 | 9302.22 | 96395805.12 | 24098951.28 | 9639580.51 | 14459370.76 |
| ROYAL BANK OF CANADA-TORONTO | 220 | .2500 | .00 | .00 | .00 | .00 | .00 |
| ROYAL BANK OF SCOTLAND-LONDON | 220 | .2500 | 14939.21 | 154810053.49 | 38702513.37 | 15481005.34 | 23221508.02 |
| ROYAL TRUST CO. OF CANADA | 220 | .2500 | .00 | .00 | .00 | .00 | .00 |
| SAMUEL MONTAGU AND CO. (JERSEY) | 220 | .2500 | 1279.06 | 13254472.42 | 3313618.10 | 1325447.24 | 1988170.86 |
| SAMUEL MONTAGU CO. LTD. | 220 | .2500 | 8685.39 | 90003801.44 | 22500950.36 | 9000380.14 | 13500570.21 |
| SAUDI AMERICAN BANK-RIYADH | 220 | .2500 | 14389.38 | 149112348.48 | 37278087.12 | 14911234.84 | 22366852.27 |
| SAUDI BRITISH BANK | 220 | .2500 | 2558.11 | 26508841.22 | 6627210.30 | 2650884.12 | 3976326.18 |
| SAUDI CAIRO BANK | 220 | .2500 | 852.70 | 8836245.86 | 2209061.46 | 883624.58 | 1325436.88 |
| SAUDI INTL. BANK | 220 | .2500 | 71925.13 | 745336147.14 | 186334036.78 | 74533614.71 | 111800422.07 |
| SCANDINAVIAN BANK LTD. | 220 | .2500 | .00 | .00 | .00 | .00 | .00 |

| NOME DO CREDOR | MOEDA | ALJOUSTO DO I.R. | JUROS PROJ. A TRANCHE I | CONTRAVALOR BRUTO EM CRS DOS JUROS | IMPOSTO DE RENDA S/JUROS | BENEFICIO PECUNIARIO SOBRE JUROS | RECOMINENTO LIQUIDO DE I.R. S/JUROS |
|---|---|---|---|---|---|---|---|
| SEATTLE FIRST NATIONAL BANK-INT. | 220 | .2500 | 33530.71 | 347467570.82 | 86866892.70 | 34746757.08 | 52120535.62 |
| SECURITY PACIFIC NAT. BANK-L.A. | 220 | .2500 | .00 | .00 | .00 | .00 | |
| SHANGAI COMMAL. BANK LTD. | 220 | .2500 | 426.34 | 4418019.30 | 1104504.82 | 441801.93 | 662702.89 |
| SHAMMUT BANK OF BOSTON | 220 | .2500 | 7034.21 | 72893173.49 | 18223293.37 | 7289317.34 | 10933976.02 |
| SHAMMUT WORCESTER COUNTY BANK | 220 | .2500 | 239.81 | 2485071.09 | 621247.77 | 248507.10 | 372760.66 |
| SINGAPORE NOMURA MERCHANT BK | 220 | .2500 | 852.70 | 8836245.86 | 2209061.46 | 883624.58 | 1325436.88 |
| SINGER FRIEDLANDER LTD. | 220 | .2500 | 35.64 | 369325.44 | 92331.36 | 36932.54 | 55398.81 |
| SOCIETY NATIONAL BK OF CLEVELAND | 220 | .2500 | 1308.13 | 13555715.14 | 3388928.78 | 1355571.51 | 2033357.27 |
| SOC. FIN. EUROP. FIN. CO. N.V. | 220 | .2500 | .00 | .00 | .00 | .00 | .00 |
| SOUTHEAST BANK N.A.-MIAMI | 220 | .2500 | .00 | .00 | .00 | .00 | .00 |
| SOUVRAIN BANK N.A. | 220 | .2500 | 683.27 | 7080499.25 | 1770124.81 | 708049.92 | 1062074.88 |
| SPAREKASSEN SDS, CAYMAN BRANCH | 220 | .2500 | 852.70 | 8836245.86 | 2209061.46 | 883624.58 | 1325436.88 |
| STANDARD CHARTERED BANK LTD. | 220 | .2500 | 44040.19 | 456373808.90 | 114093452.22 | 45637380.89 | 68456071.33 |
| STANDARD CHARTERED MERCHANT BANK | 220 | .2500 | .00 | .00 | .00 | .00 | .00 |
| STATE BANK OF INDIA-NV | 220 | .2500 | 10377.78 | 107541474.88 | 26885368.72 | 10754147.48 | 16131221.23 |